[Cite as *Hartings v. Xu*, 2014-Ohio-1794.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

**HILLARY A. HARTINGS, ET AL.,**

    **PLAINTIFFS-APPELLANTS,**

    **v.**                          **CASE NO.  10-13-11**

**THE NATIONAL MUTUAL
INSURANCE COMPANY, DBA
CELINA INSURANCE GROUP, ET AL.,**

    **DEFENDANTS-APPELLANTS,**
    **-and-**                           **O P I N I O N**

**JINGHAO XU, ET AL.,**

    **DEFENDANTS-APPELLEES.**

---

**Appeal from Mercer County Common Pleas Court
Trial Court No. 12-CV-003**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:   April 28, 2014**

---

**APPEARANCES:**

    *Bradley A. Powell* **for Appellants Hartings**

    *Robert B. Fitzgerald*  **for Appellants, The National Mutual Ins. Co.**

    *Krystle N. Marko*  **for Appellee, Rite Rug, Co.**

    *Lisa A. Hesse* **for Appellees, Asiana Floors, Inc., etc.**

Case No. 10-13-11

**ROGERS J.**

{¶1} Plaintiffs-Appellants, Hillary Hartings; Rebecca Bruns, Administratrix of the Estate of Aubrey Bruns; Rebecca and John Bruns, as parents and natural guardians of Conner D. Bruns; Rebecca Bruns and John Bruns, as parents and natural guardians of Keaton Bruns; Rebecca Bruns, individually; and John Bruns, individually (collectively "Hartings"), and Defendants-Appellants, the National Mutual Insurance Company d/b/a Celina Insurance Group and Ohio Mutual Insurance Company (collectively "the Insurance Companies"), appeal the judgment of the Court of Common Pleas of Mercer County, granting summary judgment in favor of Defendants-Appellees, Jinghao Xu; Asiana Floors, Jung Ho[1] Bae, and Kim Bae[2] (collectively "the Baes"); and Rite Rug Company ("Rite Rug"). On appeal, Hartings and the Insurance Companies argue that the trial court committed the following errors: (1) granting summary judgment in favor of Rite Rug and the Baes by finding that Xu was an independent contractor; (2) granting summary judgment as the decision was based upon a mistake of law; and (3) granting summary judgment in favor of Rite Rug and the Baes on the issue of negligent hiring and retention of Xu. For the reasons that follow, we reverse in part and affirm in part the trial court's judgment.

---

[1] We note Jung Ho Bae's name has also been spelled Jung Hoe Bae in the record.
[2] Kim Bae is also known as Hyo Min Kam and is married to Jung Ho Bae.

**{¶2}** On October 15, 2011, Hillary was driving her vehicle northbound on US Route 127 in Mercer County, Ohio. Hillary's three young cousins, Keaton, Connor, and Aubrey Bruns, were also in her vehicle. Xu was driving his vehicle westbound on State Route 119, approaching the intersection with US Route 127, when he failed to stop at a stop sign and crashed into Hillary's vehicle. It is undisputed that Xu's failure to either stop or yield to Hillary's vehicle constituted negligence and was the cause of the accident.[3] As a result of Xu's negligence, Hillary, Keaton, and Connor sustained serious injuries, while Aubrey, who was only three years old, was killed.

**{¶3}** Detective Megan Baker, from the Mercer County Sheriff's Office, was assigned to investigate this accident. In a sworn affidavit, she stated that she was unable to speak with Xu at the accident scene because he could not read or speak English. She took Xu's Illinois driver's license and ran it through central dispatch. The driver's license was not valid at the time of the accident. (Docket No. 133, p. 1). Detective Baker stated that she contacted the Illinois Department of Motor Vehicles and confirmed that Xu's driver's license had been cancelled on July 10, 2009. (*Id*. at p. 2). Detective Baker also obtained a copy of Xu's driving record which revealed the following convictions: (1) on November 6, 2007, Xu was convicted of an assured clear distance violation; (2) on December 13, 2007, Xu

---

[3] According to the record, Xu was convicted of aggravated vehicular manslaughter and subsequently deported to China.

was convicted of a one way traffic violation; and (3) on February 1, 2008, Xu was convicted of failure to control. (*Id.*).

{¶4} On January 6, 2012, Hartings filed a complaint against Xu, the Insurance Companies, Jane/John Doe, and XYZ Corp. Hartings' complaint asserted nine claims: (1) personal injuries for Hillary Hartings; (2) personal injuries and wrongful death for Aubrey Bruns; (3) personal injuries for Connor Bruns; (4) personal injuries for Keaton Bruns; (5) medical expense and parental consortium for Rebecca and John Bruns; (6) declaratory judgment and underinsured claims against National Mutual Insurance Company; (7) declaratory judgment and underinsured claims for Celina Insurance Group; (8) vicarious liability for John and Jane Doe/XYZ Corp; and (9) negligent hiring and negligent supervision for John and Jane Doe/XYZ Corp.

{¶5} On March 5, 2012, the Insurance Companies filed their answers. Hartings' complaint was amended on July 5, 2012, to add Rite Rug Co., Asiana Floors, Inc., Jung Ho Bae, Ok Yeun Kinsley, and Hyo Min Kam as Defendants. Rite Rug filed its answer to the amended complaint on July 19, 2012. Rite Rug also filed a cross-claim against the Baes on July 23, 2012. On April 3, 2012, the Baes filed their answer to the amended complaint, and on August 6, 2012, they filed their answer to Rite Rug's cross-claim. On August 8, 2012, the Insurance

Companies filed its answers to the amended complaint. On December 14, 2012, Hartings voluntarily dismissed the complaint against Ok Yeun Kinsley.[4]

{¶6} On January 30, 2013, Rite Rug filed a motion for summary judgment. The Baes also filed a motion for summary judgment on February 1, 2013. On February 21, 2013, Hartings filed memorandums in opposition to the motions for summary judgment filed by Rite Rug and the Baes. On February 21, 2013, the Insurance Companies also filed memorandums in opposition to Rite Rug's and the Baes' motions for summary judgment.

{¶7} Throughout these pre-trial proceedings, numerous depositions were taken. The following relevant evidence was adduced from these depositions.

*The Baes*

{¶8} Kim came to the United States from South Korea in 1997. She currently has her green card and can read and speak English. In 2002, Kim began to help Jung Ho Bae[5] install flooring. Kim subsequently married Bae in 2003. At that time, Bae was working for Rite Rug. Kim installed flooring for four months and then began assisting with paperwork and other office related tasks.

{¶9} Bae created a flooring business that has gone through several different name changes. In 2006, his business was called Jay Floorings. The business

---

[4] Ok Yeun Kinsley is Kim Bae's mother.
[5] Since Jung Ho Bae created a business that he named after himself, from now on we will refer to Jung Ho Bae, the individual, as "Bae" and his business as "Jung Ho Bae" in an attempt to avoid confusion among our readers.

name changed to Asiana Flooring Incorporated in 2007. Kim testified that they only used the name "Asiana Flooring Inc." for two years.[6] Finally, in 2009, the business name changed to Jung Ho Bae. Jung Ho Bae operates as a sole proprietorship.

{¶10} Kim testified that the purpose of Jung Ho Bae was to deliver and install Rite Rug flooring for Rite Rug. Jung Ho Bae has been working exclusively for Rite Rug since 2002. Kim Bae Dep., p. 34-35. Kim also stated that Jung Ho Bae does not have an office address, but instead has space inside the Rite Rug warehouse in West Chester, Ohio.

{¶11} Kim testified that it was Jung Ho Bae's responsibility to find competent drivers and installers for Rite Rug. Kim also testified:

Q:   Whose decision – whose ultimate decision was it to select or hire individuals to deliver and install [for] RiteRug[7]?

A:   Jung Ho Bae.

Q:   Okay. RiteRug didn't place any restrictions on who you could hire?

A:   No.

Q:   Did RiteRug require Jung Ho Bae to make certain that whoever was delivering or installing their product [have] a valid driver's license?

---

[6] However, several checks, which were dated July 1, 15, and 22 of 2011, were issued by Asiana Flooring Inc. to Xu. Kim Bae Dep., p. 166-167; Kim Bae Dep., Exhibit 4, p. 1-3.
[7] We note that in some of the depositions, Rite Rug is incorrectly spelled as one word.

A:   Yes.

Q:   Did they require that anybody who was delivering or installing their product [have] a particular type of driving record –

A:   No.

Q:   -- meaning – okay.  Did RiteRug require Jung Ho Bae to make certain that whoever you selected or hired to deliver or install their product was able to communicate in English?

A:   No.

Q:   Did RiteRug ever, and I mean from the time this agreement was signed in 2002 to the present, did RiteRug ever get involved with the process of selecting who was to perform the delivery and installation of the product?

A:   No.

*Id*. at p. 43-45.

{¶12} Although Kim testified Rite Rug was never involved in the hiring of the installers, Kim stated that Rite Rug would sometimes tell her not to send an installer to a specific job site and Kim would follow those instructions.  *Id*. at p. 46.

{¶13} Kim works closely with the office manager of Rite Rug.  Every day, the office manager will give Kim work orders, and then Kim will assign the different work orders to the Jung Ho Bae installers.  After the work orders are completed, Kim returns a list of completed jobs to the office manager and gets paid.  Kim elaborated on her relationship with Rite Rug:

A:   In the morning they give me the schedule.

Q:   All right.  So, there was no phone call to you.  It was something left on your desk?

A:   Yeah.  They leave it on the desk, schedule and work order.

Q:   What's the difference between a schedule and a work order?

A:   Scheduling is just – they just type it in the computer, you know, job name and, you know, how much amount of the work under next to it, so we can just write it down, who's doing what job, just record of it.

Q:   And those documents would be placed on your desk before you arrived in the morning?

A:   Yes.

Q:   What time did you normally arrive in the morning?

A:   Six o'clock.

* * *

Q:   Okay.  What do you do next?  After you receive the schedule, the work order, review the schedule and work order to make certain all of the documents are in place, what's the next thing you do?

A:   Put a name on the schedule and installer's name on the work orders.  I pick up the job for work orders, and I figure it out, who's going to do which job, and I put their name on the work order and also put the name on their schedule, my schedule, too, so I know who did which job, which guy did which job.

*Id*.  at p. 52-53, 55-56.

{¶14} Jung Ho Bae has fifteen installers who are all Chinese or Korean. The installers come to Jung Ho Bae's office space in the Rite Rug warehouse to find out their job assignments every morning. Ted Han is an installer for Jung Ho Bae and also helps Kim with paperwork. Every morning, the different installers will talk to Han, who is in charge of distributing the job assignments. Once the installers receive their assignments, they pick up the flooring material at a different area in that same Rite Rug warehouse.

{¶15} Kim testified that Rite Rug, not Jung Ho Bae, inspects the installers' work. She also explained that if an installer is new, someone from Jung Ho Bae will walk the job site with the new installer, but stated that Jung Ho Bae does not train any of its installers. Kim also stated that she has an ongoing relationship with all her installers. She also testified that the installers are not allowed to pick up the Rite Rug materials and install the flooring whenever they like. Instead, there are certain hours when they must pick up the Rite Rug materials and the installers must install the flooring on the date listed on the work order.

{¶16} Kim also testified that, to her knowledge, the installers do not work for anyone else. The installers get paid on a weekly basis and get paid depending on how many jobs they complete. When asked if Jung Ho Bae can fire the installers it retains, Kim stated:

Q:  Can you fire them?

A:    Yeah.  If I don't like them, we can let them go, but, you know –
but we never done that.

Q:    You haven't done that, but you have the right to fire somebody
that you don't feel is doing a good job?

A:    Yeah.  If he keeps, you know, messing up the job or not
showing up, then you know, I use somebody else, because they're
just subcontractor.

Q:    Has any of these deliverers or installers quit?

A:    Yes.

Q:    There is nothing in any employment agreement or any written
agreement between Jung Ho Bae and the installers that prevent them
from quitting.  Correct?  They can quit if they don't want to keep
working for you?

A:    They can quit, yeah.

*Id*. at p. 119-120.

{¶17} Kim admitted that Jung Ho Bae does not conduct criminal background checks before they hire installers or check an applicant's driving history.  Kim stated she checks to make sure that each installer has a valid driver's license by "[l]ooking at their ID." *Id*. at p. 123.  She also stated that she does not require the installers to speak or communicate in English.  While Kim requires that the installers have insurance coverage, she does not ask for proof of insurance or verify that the installers actually obtain the insurance. *Id*. at p. 125.

{¶18} Kim also explained how she met Xu. According to Kim, she first met Xu in February or March 2011. Xu was introduced to her by another Rite Rug installer, Mr. Choi. Kim stated that when she met Xu, he had stated that he recently came to Cincinnati and moved from either Indiana or the Cleveland area. Kim also testified that Xu had signed a subcontractor agreement form before he started working for Jung Ho Bae. The subcontractor form was written in both Korean and English. It stated, in relevant part:

Tools and/or supplies and vehicle are to be furnished by the installer.

Once installer leaves warehouse, he/she assumes all responsibility of material being short and/or lost.

Any poor working condition <u>must</u> be reported immediately. Otherwise installer assumes responsibility of damaged and/or poorly installed materials.

Installer assumes all responsibility for job, once it is handed to them. Amy [sic] failure to complete job, either due to accident of [sic] illness, must be reported immediately.

Installer must maintain a clean, safe working environment at all times while on job site. Any fines due to a failure to comply is [sic] the installers [sic] responsibility.

Installer must have cell phone or way to communicate.

Installer <u>must</u> have a valid driver's license and car insurance at all times.

Installer <u>must</u> be bonded and certified. Any bodily injuries, either to others and/or themselves, including personal property and/or

> property at jobsite is the responsibility of the installers while traveling to jobsite, on jobsite and/or travelling from jobsite.

(Emphasis sic.)  Kim Bae Dep., Exhibit 3, p. 1.

{¶19} Kim looked at the expiration date[8] of Xu's driver's license.  She was unaware that he had an invalid license from the State of Illinois.  She did not ask Xu about prior car accidents or if he had any previous moving violations.  Kim has never driven with Xu.  Kim also had the following discussion concerning whether Xu could read street signs.

> Q:   How do you know that – he doesn't communicate in English. How do you know that he can safely operate this vehicle to get to the job site?  How do you know that?
>
> A:   He – I ask him, "do you know how to read the map?"  He say, "Yes."
>
> Q:   Well, he can read the map, but he can't read the road signs. Correct?
>
> A:   Well, let me explain.
>
> Q:   If you know.
>
> A:   Yeah.  Let me explain.
>
> Q:   Go ahead.
>
> A:   If the road name is like Smith Road, he'll look at the Smith Road, and he look for the Smith Road.  And then, you know, it will say "right on" with the picture, you know, on the Map Quest.   So, he just look at that, and, you know – I told him – and, you know,

---

[8] It is undisputed that Xu's license, although cancelled, was not expired at the time of the accident.

when he start to working, we gave him Map Quest, just what company attached. He never had problems. But, you know, I never speak any English with him. So, I don't know how much English he have, either, you know, but he just told me he doesn't speak any English.

Kim Bae Dep., p. 162-163.

{¶20} Kim also recalled Xu coming to the warehouse on October 14, 2011. She assigned Xu to install flooring for TK Kunkler at 406 Lowry Road, Fort Recovery, Ohio ("the Kunkler job"). She testified that a map was attached to the Kunkler job work order. After she assigned Xu the Kunkler job, Kim assumed that Xu went to pick up the flooring material at a different part of the warehouse and then he left to complete the job. Kim stated that Xu was supposed to do the Kunkler job on Friday.

Q: So, he was supposed to deliver and install the material at the Kunkler address in Fort Recovery, Ohio on October 14th, 2011, on a Friday?

A: Yes.

Q: And that's because that's Jung Ho Bae's policy and procedure with respect to how the work and when the work is to be performed?

A: Yes.

Q: And he was to complete the job that day, because it was a vinyl job that should only last one day?

A: Yes. And it was a small job, too.

*Id.* at 180-181.

-13-

{¶21} Kim testified that she learned Xu was in a car accident on Saturday after Han called her and informed her about the accident. She further stated that it was not until that following Monday when she discovered that Xu was on his way to complete the Kunkler job when he got into the car accident. Jung Ho Bae had also scheduled Xu a repair job on Saturday, October 15, 2011, in Beavercreek, Ohio ("Beavercreek repair job"). Xu completed the Beavercreek repair job before he got in the car accident.

*Rite Rug*

{¶22} Rite Rug is a flooring distributor who sells and installs flooring. Rite Rug's headquarters are in Columbus, Ohio but they do business all throughout Ohio and in Indiana, Illinois, North Carolina, South Carolina, Tennessee, Kentucky, Pennsylvania, and Georgia. Rite Rug sells all sorts of flooring products such as carpet, tile, hardwood, vinyl, and laminate. Rite Rug's customers mostly consist of new home builders. Once a future homeowner selects the material he or she wants installed, the builder will notify Rite Rug of the type and amount of material that is needed for that specific house. The price for the material is negotiated and then a date for installation of the material is scheduled. All of the flooring material is stored in the Rite Rug warehouse. The material is owned by Rite Rug until it is installed in the home.

{¶23} Vince Moyer, Rite Rug's builder operations manager, was deposed in this matter. It is Moyer's responsibility to make sure the home builders are satisfied with the installation of Rite Rug's flooring materials. Moyer was able to explain Rite Rug's relationship with Jung Ho Bae:

> A: Rite Rug – builders call in their jobs they have for tomorrow, a week from now. It's put on a schedule. The jobs are then all given to Kim Bae. She then dispatches it to other subcontractors that go out and do the work.
>
> Q: And where does Kim get the list of jobs from? Does she get them from, for example, you, or does she get them from home office, or where does she get them from?
>
> A: The Cincinnati office scheduling box.

Moyer Dep., p. 13-14.

{¶24} Moyer was also able to explain the hiring process for installers. Moyer stated:

> A: We would get a packet from our corporate office that has subcontractor information that you have to fill out from – and I don't know all of the packages, but I know there's, like, W-2 forms, subcontractor agreement, and forms like that –
>
> Q: Okay.
>
> A: -- a big packet that we have to give to every installer that wants to become a subcontractor for Rite Rug, background check.
>
> * * *
>
> Q: * * * Does it include, for example, do I need insurance?

A:   You need insurance.

Q:   Okay.   Is that automobile insurance and general liability insurance?

A:   Yes.

Q:   Okay.  You said there's a background check?

A:   Yes.

Q:   Is that a criminal background check?

A:   Not sure.

Q:   Okay.  What about driving record?

A:   I know they make a copy of their driver's license and send it in, but what our corporate office does with it, I couldn't tell you.

*Id*. at p. 20-22.

{¶25} Once the application is completed, Moyer will send it into the corporate office and get a response whether the applicant can work as a subcontractor for Rite Rug.  Moyer does not verify any of the information in the application packets because that is the corporate office's responsibility.

{¶26} While Rite Rug supplies installers with materials for installation, it does not provide tools or cars to installers.  Moyer stated that all the new home builders have an understanding that the installation is done by subcontractors. Moyer also stated:

Q: Sure. [The builders] rely upon you, Rite Rug, to make the selection of who installs the material that they've ordered from Rite Rug. Correct?

A: Correct.

Q: You sell yourself as being able to provide that service. Correct?

A: Yes and no. We don't sell ourselves to provide it, because we don't install it. We hire subcontractors to do it, and they know that.

*Id.* at 109.

{¶27} When asked whether Rite Rug has the ability to ban installers from certain job sites, Moyer had the following exchange:

Q: Have you, in your years of working with Kim, ever told her to not use a particular individual crew member or any crew?

A: I'm sure I have. I mean, I'm sure there's been builders that have said, "We don't want Mr." – I'm going to say Thomas, or, you know, but –

Q: Sure.

A: "We don't want Mr. Thomas back on this job site." So, that would be myself or Aaron or someone to call Kim and say, "hey, Joe from Ryan Homes does not want Mr. Thomas back on the job site."

Q: And you have the right to do that, don't you, Rite Rug?

A: Try not to say –

Q: Rite Rug has the right to say this person isn't wanted on the job site. Correct?

A: If our customer tells us that, yes, absolutely.

-17-

*Id.* at p. 125.

**{¶28}** Moyer also stated that he is unaware whether the installers work for any other companies, but knew that in the past, some installers advertised their services for other companies.

**{¶29}** Aaron Bayer, the production manager for Rite Rug, was also deposed and testified as to Rite Rug's policies and procedures. He stated that it is Rite Rug's policy for the installers to come to the warehouse to "pick up, inspect the material, load the material[,] and then deliver [it]." Bayer Dep., p. 37. Bayer also testified that it is Jung Ho Bae's responsibility, not Rite Rug's, to assign the installers to the different job sites. He stated that Jung Ho Bae was already working for Rite Rug in 2007 when he started working for Rite Rug. Bayer admitted that he personally does nothing to ensure that the installers are competent to drive. He stated he is unaware if Rite Rug does anything to verify the installers are competent drivers. Bayer also explained that Rite Rug provides all the installers with maps and directions to each job site "[t]o make sure they know how to get there." *Id.* at p. 43.

**{¶30}** When asked how Rite Rug obtains installers, Bayer testified:

Q: Okay. All right. Well, let's go on to the installation phase. Who installs RiteRug's product?

A: Installers.

Q:   Where does RiteRug obtain installers?

A:   We don't have any installers.

Q:   How do you know that?

A:   We hire Kim, Asiana Floors or Jung Ho Bae to install our floors, and however she handles that is up to her, as long as the jobs get done.

*Id*. at p. 45-46.

**{¶31}** Bayer explained that part of his job is to inspect the work that is done by the installers.  Bayer also stated:

Q:   Does RiteRug provide training to these installers?

A:   No.

Q:   How do you know that?

A:   It would be up to me or Vince [Moyer] to set up some type of training.

Q:   You expect and require that the installers, that they've been trained on how to install RiteRug's product?

A:   Yes.

Q:   And they need to know how to install product according to the trade, the industry and the manufacturer's specifications.  Correct?

A:   Correct.

*Id*. at p. 48.    Bayer stated that Rite Rug usually does not need to provide instruction or guidance to the installer on particular jobs, but "[o]ccasionally it

does." *Id*. a p. 52. Bayer testified that there have been times when he has instructed Kim not to send back the original installer on a job when the installer has made a significant mistake.

{¶32} Bayer agreed that "the delivery and the installation is an integral part of the RiteRug business of selling flooring[.]" *Id*. at p. 58-59. Bayer also stated that Jung Ho Bae is the exclusive installer for the builder division of the non-carpet materials. Bayer also admitted that Rite Rug advertises itself as a "seller and installer of floor materials." *Id*. at p. 143. He elaborated:

> Q: Okay. So, when you're working with these builders or the homeowners in the retail arena, you don't say, 'Hey, we'll sell you the materials and then we're going to hire somebody else to install them,' do you?
>
> A: No, we do not, as far as I know.
>
> Q: It comes as a package. RiteRug is selling this and installing it for you. Right?
>
> A: As far as I know, yes.

*Id*. at p. 143-144.

{¶33} Bayer testified that Jung Ho Bae installers are not allowed in the warehouse when the warehouse is closed. He also testified that Jung Ho Bae has had a space in the warehouse since he started working for Rite Rug. When asked if he was aware that Jung Ho Bae used installers who were not legal residents of the United States, Bayer replied, "I don't know." *Id*. at p. 101.

**{¶34}** Erin Appleman is the advertising director for Rite Rug and is "[r]esponsible for media buys, marketing materials, and communication to the public in the form of advertising." Appleman Dep., p. 8. Appleman was able to talk about Rite Rug's website, specifically, their installation FAQ section. She stated:

> Q: You used phrases [on Rite Rug's website] such as Rite Rug's installers, our installers, we. Do you agree that the intention of – your intention was to notify the reviewing public or the viewing public of the website that it was Rite Rug's people that were going to install the Rite Rug product?
>
> A: No.
>
> Q: What was your intention?
>
> A: That Rite Rug installs the products that they sell.
>
> * * *
>
> Q: Okay. Why didn't you say subcontractors in the website?
>
> A: No reason. I mean, we didn't.

*Id*. at p. 41.

> On Rite Rug's installation section of their website it states:
>
> Once you purchase your Rite Rug carpet, hardwood, laminate, tile or vinyl flooring at any of our locations, we'll set up installation immediately.
>
> And even though our team of professional installers reports to us, they work for you, ensuring your satisfaction at every turn. They're quick, polite, tidy and experienced. Why we'd even say you can

expect the professional installation and customer service you get from Rite Rug to be "seamless."

Appleman's Dep., Exhibit A, p. 3.

{¶35} The website also has a section about installation warranties. Appleman did not know why Rite Rug would give a warranty on an installation performed by subcontractors. Appleman testified that none of her superiors have ever told her to change the wording in the installation section of Rite Rug's website.

{¶36} Michael Nelson, Rite Rug's corporate warehouse manager, was also deposed. He testified that although Rite Rug does not give formal evaluations of its installers, Rite Rug does train its installers.

Q: * * * How did you make certain that Rite Rug's installers were meeting the industry standards?

A: Through meetings, through training.

Q: With the installers?

A: Yes. Sir.

Q: Do you recall, you know, any of those particular circumstances? Were these like a field day or operations day at Rite Rug where people who were doing installation would have to do come up for training, or would they be one-on-one type training with installers?

A: Both.

Nelson Dep., p. 47.

**{¶37}** Nelson also testified that Rite Rug does not do anything to verify its installers are competent to deliver its materials.

Q:     * * * What did Rite Rug do to make certain that the person who was delivering Rite Rug's product to the job site was competent to deliver that material, to drive that vehicle containing Rite Rug's product from the warehouse to the job site?

A:    Nothing that I'm aware of.

Q:    Now I want to break that down just to make sure we cover everything. Did Rite Rug make certain that the individual who was driving, delivering the material, had a valid driver's license?

A:    No, sir.

Q:    Did they make certain that that driver or deliverer had car insurance?

A:    No, sir.

Q:    Did they do anything to make certain that person who was delivering the product could communicate in English?

A:    No, sir.

*Id.* at p. 56-57.

**{¶38}** Nelson also testified that installers get paid on a regular basis and the amount of their pay check is based on how many jobs that installer completed in a pay period. However, if, after Rite Rug's inspection, it finds that the job was completed incorrectly, it will back-charge the installer for that job and he will not get reimbursed until the job is done correctly.

{¶39} Nelson also testified that he knows that Rite Rug's carpet installers are employees, however, he was unaware if the installers of hard surface flooring are Rite Rug employees. *Id*. at 424. Nelson also stated that he has precluded an installer from working for Rite Rug. Nelson stated that "there were decisions made that this particular installer was – was not of the quality we wanted, so we were no longer going to use their services." *Id*. at p. 44-45. This happened on more than one occasion.

*Xu*

{¶40} Xu testified at his deposition[9] that he does not know Jung Ho Bae or Kim Bae. He stated he knew Han, but never went to a warehouse near Cincinnati. When presented with the subcontractor agreement he signed for Jung Ho Bae, Xu adamantly denied that he had signed the agreement or had even seen it before. He also stated that no one has ever explained the terms of the contract to him.

{¶41} Xu explained that every work site he has worked on had a supervisor. If he needed to ask the supervisor a question, he would call Han, and Han would translate for him. He purchased all tools needed to install floors and also bought the van he drove. He also explained that he does not need any instructions or directions on how to install flooring because "all information was contained in the work order[.]" *Id*. at p. 177.

---

[9] Since Xu does not speak English, a translator was present during his deposition and translated for Xu.

**{¶42}** Xu thought that at the time of his car accident he had a valid driver's license. He also testified:

Q: Were you able to understand, based on the map, where the job site was?

A: Yes, I can.

Xu Dep., p. 138. Xu also admitted that at the time of the accident he was on his way to a job site.

**{¶43}** Xu also stated:

Q: Okay. If he didn't want to do a job, could he turn it down?

A: Of course. Yeah, for example, if on the same day maybe the first one call and the second one call right away, I have to refuse.

Q: Because he couldn't be in two places at the same time?

A: No.

Q: Okay. But whether or not he declines a job is up to him, correct?

A: Yes, I decide myself.

*Id.* at p. 141-142.

**{¶44}** Xu could correctly identify what a stop sign looks like. Also he stated he has a GPS device in his car. Xu also stated that he looked up directions on his computer at home to figure out how to get to the job site on October 15, 2011. He memorized the route and drew himself a "simple map." *Id*. at p. 144.

-25-

According to Xu, Mr. Choi met Xu at his house and gave him materials for the Kunkler job. He also denied doing a repair job in Beavercreek, Ohio the morning of October 15, 2011.

{¶45} Xu testified that it was his belief that he had a valid driver's license on October 15, 2011. He further stated:

> Q: So it's your testimony that you did not know that the state of Illinois cancelled your license on July 20th, 2009; is that correct, July 10th, 2009?
>
> A: I have no way to know because there was no notice, no mailing, no message. And when I bought my car nobody tell me anything about my driver's license being a problem. I have no way to know.
>
> Q: Where were you living in Chicago?
>
> A: A friend's place.
>
> Q: Where was your friend's place?
>
> A: No, no idea.
>
> Q: Do you remember the address you gave the Department of Motor Vehicles in Illinois as to where you lived?
>
> A: Don't remember.
>
> Q: Do you remember giving them the address of a furniture store in Illinois as your home address?
>
> A: I have no idea.
>
> Q: You don't remember that, is that what you are telling me? You don't remember giving the Illinois Bureau of Motor Vehicles the address of a furniture store as your home address?

A: No idea.

*Id*. at p. 188-189.

**{¶46}** On May 8, 2013, the trial court granted summary judgment in favor of the Baes and Rite Rug.

**{¶47}** Hartings and the Insurance Companies filed this timely appeal, presenting the following assignments of error for our review.

*The Insurance Companies' Assignment of Error No. I*

**THE TRIAL COURT ERRED IN SUSTAINING DEFENDANTS/APPELLEES [SIC] MOTION[S] FOR SUMMARY JUDGMENT WHEN GENUINE ISSUES OF MATERIAL FACT EXISTED[.]**

*The Insurance Companies' Assignment of Error No. II*

**THE TRIAL COURT ERRED IN SUSTAINING DEFENDANTS/APPELLEES [SIC] MOTIONS FOR SUMMARY JUDGMENT AS THE DECISION WAS BASED UPON A MISTAKE OF LAW[.]**

*Hartings' Assignment of Error No. I*

**THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS-APPELLEES, RITE RUG CO. AND/OR THE BAES BY RULING, AS A MATTER OF LAW, THAT XU WAS AN INDEPENDENT CONTRACTOR OF RITE RUG CO. AND/OR THE BAES.**

*Hartings' Assignment of Error No. II*

**THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS-APPELLEES, RITE RUG CO. AND THE BAES ON THE ISSUE OF THE NEGLIGENT HIRING AND RETENTION OF XU.**

{¶48} Due to the nature of the assignments of error, we elect to address them out of order and address the Insurance Companies' and Hartings' first assignments of error together.

*Insurance Companies' Assignment of Error No. II*

{¶49} In its second assignment of error, the Insurance Companies contend that the trial court erred in applying the standard set out in *Bostic v. Connor*, 37 Ohio St.3d 144 (1988), since *Bostic* has been superseded in statute after the enactment of R.C. 4123.01(A)(1)(c). We disagree.

{¶50} The Insurance Companies argue that the trial court erred by not using the proper test for determining whether Xu was an employee or an independent contractor. They contend that the common law test set out in *Bostic* was superseded in statute after the enactment of R.C. 4123.01(A)(1)(c). However, it is Rite Rug's and the Baes' contention that even if *Bostic* was superseded by R.C. 4123.01(A)(1)(c), since the present case does not deal with workers' compensation, R.C. 4123.01(A)(1)(c) is irrelevant. We find that the legislature only intended to redefine employees as it relates to construction contracts in workers' compensation cases when it enacted R.C. 4123.01(A)(1)(c).

-28-

**{¶51}** R.C. 4123.01(A)(1)(c) states, in relevant part:

*As used in this chapter:*
(A)(1) "Employee" means:

* * *

(c)   Every person who performs labor or provides services pursuant to a construction contract, as defined in section 4123.79 of the Revised Code, if at least ten of the follow criteria apply:
(i)      The person is required to comply with instructions from the other contracting party regarding the manner or method of performing services;
(ii)     The person is required by the other contracting party to have particular training;
(iii)    The person's services are integrated into the regular functioning of the other contracting party;
(iv)    The person is required to perform the work personally;
(v)     The person is hired, supervised, or paid by the other contracting party;
(vi)    A continuing relationship exists between the person and the other contracting party that contemplates continuing or recurring work even if the work is not full time;
(vii)   The person's hours of work are established by the other contracting party;
(viii)  The person is required to devote full time to the business of the other contracting party;
(ix)    The person is required to perform the work on the premises of the other contracting party;
(x)     The person is required to follow the order of work set by the other contracting party;
(xi)    The person is required to make oral or written reports of progress to the other contracting party;
(xii)   The person is paid for services on a regular basis such as hourly, weekly, or monthly;
(xiii)  The person's expenses are paid for by the other contracting party;
(xiv)  The person's tools and materials are furnished by the other contracting party;

(xv)   The person is provided with the facilities used to perform services;
(xvi)   The person does not realize a profit or suffer a loss as a result of the services provided;
(xvii) The person is not performing services for a number of employers at the same time;
(xviii) The person does not make the same services available to the general public;
(xix)   The other contracting party has a right to discharge the person;
(xx)   The person has the right to end the relationship with the other contracting party without incurring liability pursuant to an employment contract or agreement.

(Emphasis added.)   Thus, the definition of employee contained in R.C. 4123.01(A)(1)(c) is limited to claims filed under Chapter 4123.  It is undisputed that this case does not involve a claim for workers' compensation, thus, R.C. 4123.01(A)(1)(c) is inapplicable.

{¶52} To support their position, the Insurance Companies argue that *Slauter v. Klink*, 2d Dist. Montgomery No. 18150, 2000 WL 1162041 (Aug. 18, 2000), stands for the proposition that the legislature intended to redefine employee and substitute the statutory test contained in R.C. 4123.01 for the common law standard for any case that deals with construction contracts.  We do not interpret the Second District's opinion so broadly.  In *Slauter*, the appellant was allegedly injured by a truck driven by the appellee. *Id.* at *1.  At the time, the appellant and appellee worked for the same company. *Id.*  The appellant received workers' compensation benefits for his injuries, but filed suit against the appellee claiming

that she had negligently operated the truck. *Id.* The appellee successfully asserted that she was immune from tort actions by co-workers under R.C. 4123.741. *Id.* The trial court used the statutory test found in R.C. 4123.01(A)(1)(c) to determine whether the appellee was an employee. *Id.* However, the appellant argued that the trial court should have used the common law standard. *Id.*

{¶53} The court in *Slauter* found that R.C. 4123.01(A)(1)(c), "appears to be an attempt to codify the various factual matters courts have considered when deciding if an employee relationship, including the employer's 'right to control,' exists." *Id.* at *4. The court also looked to Sub. H. Bill No. 245 for guidance and noted that the "legislature's intent in amending 4123.01 was to redefine 'employee' for *purposes of the Workers' Compensation Law*." (Emphasis added.) *Id.* Lastly, in *Slauter*, the court had to determine whether the appellee was an employee in order to see whether the immunity provision of R.C. 4123.741 applied. Since the appellee invoked a defense that was found within the workers' compensation chapter, it was appropriate for the court to use the test found in R.C. 4123.01(A)(1)(c) to determine whether she was an employee.

{¶54} Other courts have similarly agreed that the statutory test found in R.C. 4123.01(A)(1)(c) only applies to workers' compensation cases. *See Grange Mut. Cas. Co. v. Laughlin*, 5th Dist. Licking No. 12-CA-0089, 2013-Ohio-4447;

-31-

*Snyder v. Stevens*, 4th Dist. Scioto No. 12CA3465, 2012-Ohio-4120. In *Laughlin*, the court held that since "R.C. Chapter 4123 sets forth Ohio's statutory scheme for workers' compensation[,] * * * R.C. 4123.01 defines an 'employee' for purposes of workers' compensation." 2013-Ohio-4447, ¶ 21. Further, in *Snyder*, the court held that because the appellant did not "bring a claim under R.C. 4123 and [did] not cite any case law incorporating this standard into a common law negligence claim" the statutory standard was inapplicable. 2012-Ohio-4120, ¶ 27.

{¶55} While the Insurance Companies are correct in noting that *Bostic* involved a workers' compensation claims, it is apparent that courts have adopted the common law standard set out in *Bostic* to apply to all sorts of matters that do not implicate workers' compensation claims. For example, the Ohio Supreme Court has recently used the standard set out in *Bostic* to determine whether Virtual Learning Academy instructors were independent contractors or teachers entitled to compensation from the State Teachers Retirement Board. *State ex rel. Nese v. State Teachers Retirement Bd. Of Ohio*, 136 Ohio St.3d 103, 2012-Ohio-1777, ¶ 2. This court has also used the test set out in *Bostic* to determine whether a physician was an employee or independent contractor for gender discrimination purposes. *Bower v. Henry Cty. Hosp.*, 3d Dist. Seneca No. 13-12-46, 2013-Ohio-2844, ¶ 28.

{¶56} Therefore, because Hartings did not bring a claim under R.C. 4123, we find that the statutory test found in R.C. 4123.01(A)(1)(c) is not applicable to this matter.

{¶57} Accordingly, we overrule the Insurance Companies' second assignment of error.

### The Insurance Companies' & Hartings' Assignments of Error No. I

{¶58} In their first assignments of error, the Insurance Companies and Hartings argue that the trial court erred in granting summary judgment in favor of the Baes and Rite Rug because there were genuine issues of material fact as to whether Xu was an employee of the Baes and of Rite Rug. We agree.

### Standard of Review

{¶59} An appellate court reviews a summary judgment order de novo. *Hillyer v. State Farm Mut. Auto. Ins. Co.*, 131 Ohio App.3d 172, 175 (8th Dist.1999). Accordingly, a reviewing court will not reverse an otherwise correct judgment merely because the lower court utilized different or erroneous reasons as the basis for its determination. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 148 Ohio App.3d 596, 2002-Ohio-3932, ¶ 25 (3d Dist.), citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 222 (1994). Summary judgment is appropriate when, looking at the evidence

as a whole: (1) there is no genuine issue as to any material fact, and (2) the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In conducting this analysis the court must determine "that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, [the nonmoving] party being entitled to have the evidence or stipulation construed most strongly in the [nonmoving] party's favor." *Id.* If any doubts exist, the issue must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-59 (1992).

{¶60} The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument. *Id.* at 292. The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; an adverse party may not rest on the mere allegations or denials of the party's pleadings. *Id.*; Civ.R. 56(E).

*Employee v. Independent Contractor*

{¶61} Generally, while an employer is vicariously liable for the negligent acts of its employees committed within the scope of employment under the doctrine of respondeat superior, an employer of an independent contractor is not

-34-

liable for the negligent acts of the independent contractor.[10] *Pusey v. Bator*, 94 Ohio St.3d 275, 278 (2002); *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 438 (1994).

{¶62} To determine whether a party is an employee or an independent contractor, we must resolve the central question of "who had the right to control the manner or means of doing the work[?]" *Bostic*, 37 Ohio St.3d at paragraph one of the syllabus. This inquiry is fact-intensive and requires the consideration of a number of factors, none of which are dispositive by themselves. *Id.* at 146. Factors to be considered include "who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes traveled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts." *Id.*

{¶63} Usually, when the evidence is not in dispute or facts are admitted, the question of whether a person is an employee or independent contractor is a matter of law to be decided by the court. *Id.*; *Schickling v. Post Publishing Co.*, 115 Ohio St. 589 (1927). However, when the worker offers some evidence that he was an

---

[10] Ohio recognizes three exceptions to this rule. *Sullivan v. Oregon Ford, Inc.*, 552 F.Supp.2d 681, 685 (N.D.Ohio 2008). First, an employer may be liable for injuries that are a result of the employer's failure to "exercise reasonable care in the selection of a competent and careful independent contractor." *Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 257-258 (1990) *overruled on other grounds in Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435 (1994). Second, an employer may be liable if the independent contractor is performing a non-delegable duty imposed by statute, contract, common law, or arising from inherently dangerous work. *Id.* Third, an employer may be liable for the negligence of an independent contractor under the doctrine of agency by estoppel. *Id.* at 262-263.

employee rather than an independent contractor, the issue becomes a question for the trier of fact to decide. *Bostic* at 146-147; *see also O'Day v. Webb*, 29 Ohio St.2d 215, paragraph four of the syllabus (1972) ("It is the duty of a trial court to submit an essential issue to the jury when there *is* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue * * *.").

{¶64} Since Hartings and the Insurance Companies have presented sufficient evidence to allow reasonable minds to differ on the issue of whether Xu was an employee to the Baes and/or Rite Rug, we find that the trial court erred in granting the Baes' and Rite Rug's motions for summary judgment. Our review of the record reveals that there was evidence from which a jury could reasonably infer that Xu was either an employee or an independent contractor.

{¶65} On one hand, evidence was presented which tends to prove that Xu was an independent contractor. It is undisputed that the installers had to provide their own tools and vehicles. While it appears that Rite Rug attached a map to work orders, there was no testimony presented that the installers were instructed they had to follow these routes to the job sites. Lastly, the method of payment is also suggestive of an independent contractor since Xu was paid per job, and not at an hourly rate. While the presence of subcontractor agreements also points toward

an independent contractor relationship, Xu adamantly denied signing a subcontractor agreement, making this a disputed fact.

{¶66} On the other hand, evidence was presented which tends to indicate that the Baes and Rite Rug had the right to control the manner or means by which Xu performed his work. The mere fact that a contracting party reserves the right to approve the work of the worker does not necessarily establish an employer-employee relationship. *Perron v. Hood Industries, Inc.*, 6th Dist. Lucas No. L-06-1396, 2007-Ohio-4478, ¶ 31. Only when "the control of the work reserved in the employer which effects a master-servant relationships is control of the means and manner of performance of the work, as well as of the result; an independent contractor relationship exists * * *." *Id*.

{¶67} While it was undisputed that Rite Rug had supervisors at the job sites and inspected the work of the installers, the Insurance Companies and Hartings also presented some evidence that Rite Rug controlled the means and manner of performance of its installers. Although there was testimony that Rite Rug does not train its installers, this was contradicted by Nelson's testimony that Rite Rug does, in fact, train its installers, both in group meetings and in one-on-one sessions. Kim Bae also stated that sometimes the Baes will "walk the job site" with new installers in order to teach them how to properly install floors.

{¶68} Further, all the flooring materials that the installers use are provided by Rite Rug. After receiving a work order, the installers are directed to pick up Rite Rug flooring materials in the Rite Rug warehouse before they drive to the job sites. Testimony was elicited from both Rite Rug employees and the Baes that they retained the right to terminate installers if they did not produce satisfactory work. The fact that none of the installers were discharged is irrelevant, as long as the Baes and Rite Rug *maintained the right* to discharge an installer if necessary. The ongoing nature of the Baes' and Rite Rug's relationship also points to an employer-employee relationship. *See Harmon v. Schnurmacher*, 84 Ohio App.3d, 207, 213 (11th Dist.1992). ("[A]n independent contractor is generally hired to complete a single job only and does not have a continuing, full-time relationships with a single client."). Rite Rug has employed the Baes to provide them with installers for over 10 years and has even provided them with office space in its warehouse to conduct business. Rite Rug exclusively uses the Baes to install their flooring. Similarly, the Baes only work for Rite Rug. Thus, there is some evidence of an ongoing relationship with the installers, the Baes, and Rite Rug.

{¶69} Construing the evidence most strongly in Hartings' favor, we find that the trial court erred in granting the Baes' and Rite Rug's motions for summary judgment.

**{¶70}** Accordingly, we sustain Hartings' and the Insurance Companies' first assignments of error.

### *Hartings' Assignment of Error No. II*

**{¶71}** In her second assignment of error, Hartings contends that the trial court erred by granting summary judgment in favor of the Appellees on the issue of negligent hiring and retention. We agree.

**{¶72}** In order for a plaintiff to prove negligent hiring or retention, he or she must show:

> (1) [T]he existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.

*Evans v. Ohio State Univ.*, 112 Ohio App.3d 724, 739 (10th Dist.1996), quoting *Ruta v. Breckenridge-Remy Co.*, 6th Dist. Erie No. E-80-039, 1980 WL 351648 (Dec. 12, 1980). These elements are related to the basic elements of negligence: duty, breach, proximate cause, and damages.

**{¶73}** Regardless of whether Xu is found to be an independent contractor or

an employee of Rite Rug and/or the Baes, some sort of employment relationship[11] existed between them. Further, it is undisputed that Xu was incompetent to drive and deliver Rite Rug materials, since he did not have a valid driver's license. It is also undisputed that Xu's negligence caused the Hartings' injuries. However, the parties do dispute whether the Baes and Rite Rug had constructive knowledge of Xu's incompetence. Thus, whether the Baes and Rite Rug owed a duty to the Hartings turns on whether a reasonably prudent person, with the Baes and Rite Rug's knowledge, would have anticipated that Xu would cause a car accident.

{¶74} It is clear from the record that the Baes and Rite Rug had no actual knowledge of Xu's incompetence. The more important question is whether the Baes and Rite Rug had constructive knowledge.[12] Constructive knowledge is defined as "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person * * *." Black's Law Dictionary 404 (9th Ed.2009). The Baes and Rite Rug argue that Xu's

---

[11] For purposes of a negligent hiring or retention claim, it is irrelevant whether the worker is an employee or an independent contractor. *Albain*, 50 Ohio St.3d at 257 ("It is well-established that an employer must exercise reasonable care in the selection of a competent and careful independent contractor."); *Rodic v. Koba*, 8th Dist. Cuyahoga No. 77599, 2000 WL 1807042, fn. 2 ("[A]ppellee's assertion that an independent contractor relationship is not a sufficient basis for a negligent hiring claim is without merit."); *Best v. Energized Substation Serv., Inc.*, 88 Ohio App.3d 109, 115 (9th Dist.1993) ("[Restatement of the Law 2d, Torts (1965) 376, Section 411] recognizes liability to 'third persons' for negligent selection of an independent contractor.").

[12] Rite Rug claims in its brief, that it had "no involvement in hiring installers * * *. As such, Rite Rug would have no involvement in verifying whether an installer possessed a valid driver's license * * *." Rite Rug Br., p. 16. However, this is contradicted by the testimony of its own employee, Moyer, who testified that every installer must fill out an application packet. Moyer Dep., p. 20. As part of this application packet, the applicant must make a copy of their driver's license. *Id.* at p. 22. Once the application is complete, Moyer sends it into the corporate office and will receive a response as to whether the applicant can work for Rite Rug.

responsibility of transporting the flooring materials was incidental to his main task of installing the flooring and that since driving a car was not part of his job responsibilities, they had no duty to look into Xu's driving history. The Baes and Rite Rug point towards the subcontractor agreements they made all installers sign. They argue that these agreements do not mention that delivering goods is part of an installer's job responsibilities.

{¶75} However, this is contradicted by almost every employee who was deposed from Rite Rug. These employees testified that the transportation of the flooring materials *is* a principal responsibility of an installer. Bayer explained that all the installers are required to deliver the flooring materials to the job sites and that both the delivery and the installation was an integral part of the Rite Rug business. Bayer Dep., at p. 36-37, 58. Moyer testified that Rite Rug relies upon the installers to the deliver the materials to their job sites. Moyer Dep., p. 173. Benjamin Adams also testified that it is the installer's responsibility to pick up the flooring materials from the warehouse and deliver it to the job site. Adams Dep., p. 28-29.

{¶76} Further, Kim Bae testified that delivering materials in Xu's car was in furtherance of Jung Ho Bae's business. She also stated that the installers deliver Rite Rug's product and install it on behalf of Jung Ho Bae.

{¶77} Therefore, there is some dispute as to whether delivery was an integral part of Xu's job responsibilities. There is also the fact that Xu presented an Illinois driver's license to the Baes and Rite Rug despite not residing in Illinois for a significant period of time. Based on the unique circumstances of this case, the matter should be submitted to a trier of fact to determine whether delivery was an integral part of Xu's job responsibilities and whether the Baes and Rite Rug exercised reasonable care in selecting Xu to deliver their goods by simply looking at his driver's license.

{¶78} The Baes use *Mut. Ins. Co. of Eagle Tp. v. Hunt*, 3d Dist. Hancock No. 5-2000-07, 2000 WL 1273607 (Sept. 7, 2000), to support their position. However, *Hunt* is distinguishable from the present matter. In *Hunt* the appellants hired an independent contractor who set fire to the appellee's home. *Id*. at *1. The trial court found that the fire was caused by improperly disposing of lighted cigarettes. *Id*. This court found that even if the appellants were negligent in hiring the worker, their negligence was not the *proximate cause* of the fire since such an accident was "no more probable because the appellants had failed to inspect any of Smith's prior work, had failed to request references from him, or had failed to conduct an extensive interview or background check." *Id*. at *3.

{¶79} In this case, if the jury finds that the Baes and/or Rite Rug did not make a reasonable inquiry into Xu's driving history, the jury could also find that

the Baes' and Rite Rug's negligence was the proximate cause of Hartings' injuries. If the Baes and/or Rite Rug looked into Xu's driving history, they would have found that he did not have a valid driver's license and would not have hired him to deliver flooring materials. Had Xu not been driving Rite Rug materials to a job site on October 15, 2011, he would not have gotten into a car accident with Hartings and the Bruns and caused their injuries. Thus, we do not find the facts of *Hunt* analogous to this case.

{¶80} We similarly find the Baes' use of *Pusey v. Bator*, 94 Ohio St.3d 275 (2002), unpersuasive. In *Pusey*, the Ohio Supreme Court was outlining the general exceptions for when an employer may be responsible for the negligent acts of an independent contractor. *Id*. at 279. Specifically, the Court was explaining the inherently dangerous work exception which provides that "the employer hiring the independent contractor has a duty to see that the work is done with reasonable care and cannot, by hiring an independentcontractor [sic], insulate himself or herself from liability for injuries resulting to others from the negligence of the independent contractor * * *." *Id*. at 279-280. However, the inherently dangerous work exception does not apply when there is only a general anticipation that an independent contractor may act negligent in some way and thereby cause harm to a third party. *Id*. at 280. Since Hartings is not alleging that the Baes or Rite Rug are vicariously liable for the acts of Xu because he was engaged in an inherently

Case No. 10-13-11

dangerous activity, we do not find *Pusey* to be instructive in this matter.  Hartings asserts that the Baes and Rite Rug were negligent in *hiring* Xu, not that they were negligent in supervising Xu while he was engaged in a dangerous activity.

{¶81} Accordingly, we sustain Hartings' second assignment of error.

{¶82} Having found error prejudicial to Hartings and the Insurance Companies in their first assignment of error and in Hartings second assignment of error, but having found no error prejudicial to the Insurance Companies in their second assignment of error, we affirm in part and reverse in part the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part, and*
*Cause Remanded*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**