[Cite as *State ex rel. Ugicom Ents., Inc. v. Buehrer*, 2014-Ohio-4942.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Ugicom Enterprises, Inc., | : | |
| Relator, | : | |
| v. | : | No. 13AP-527 |
| Stephen Buehrer, Administrator, Bureau of Workers' Compensation, | : | (REGULAR CALENDAR) |
| | : | |
| Respondent. | : | |
| | : | |

D E C I S I O N

Rendered on November 6, 2014

*Zashin & Rich Co., LPA,* and *Scott Coghlan*, for relator.

*Michael DeWine*, Attorney General, and *Kevin J. Reis*, for respondent.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

CONNOR, J.

{¶ 1} Relator, Ugicom Enterprises, Inc. ("Ugicom"), brings this original action seeking a writ of mandamus ordering respondent, Stephen Buehrer, Administrator, Ohio Bureau of Workers' Compensation ("administrator"), to vacate the order of the administrator's designee which determined that certain persons were Ugicom employees, and to order the administrator to issue a new order finding that those persons were independent contractors, and thus not Ugicom employees, for the purpose of reporting payroll.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate, who has now rendered a decision and recommendation that includes findings of fact and conclusions of law and is appended to

this decision. The magistrate concluded that the adjudicating committee of the Ohio Bureau of Workers' Compensation ("BWC") abused its discretion by utilizing the statutory test in R.C. 4123.01(A)(1)(c) to conclude that the cable installers were Ugicom employees. Ugicom has filed objections to the magistrate's decision, and the matter is now before us for our independent review.

{¶ 3} As reflected in the facts given in the magistrate's decision, Ugicom is an Ohio corporation engaged in the business of laying outside cable lines exclusively for another company, Time Warner Cable ("Time Warner"). Ugicom operates as a web-based virtual office. Ugicom receives batches of jobs from Time Warner, Ugicom places those jobs onto Ugicom's website, and Ugicom cable installers view the available jobs on their home computers. Once a Ugicom worker completes a posted job, they note their completion of the job on the Ugicom website. The Ugicom cable installers are paid per job they complete and each job is coded and carries a standardized rate of pay. Ugicom workers are responsible for paying their own taxes and insurance. Ugicom believes that its cable installers are independent contractors, and each Ugicom cable installer must review and sign a contract titled "Ugicom Enterprises Independent Contractor Agreement." Pursuant to the agreement, the Ugicom cable installers agree to only perform outside cable installation for Ugicom and Time Warner.

{¶ 4} BWC Premium Auditor, Mary Jo Eyink, conducted an audit of Ugicom on October 20, 2009. Joel Wilson, CPA, prepared a statement on October 20, 2009 for Auditor Eyink. Wilson noted in his statement that "[t]he conducting of business with independent contractors as subcontractors is common for the TV cable installation business." (Stipulated Record, hereinafter "Stip.R.," 77.) Wilson stated that "[i]n between the start and finish of the job" the Ugicom cable installers have "total independence to complete the job according to specifications without supervision." (Stip.R. 78.)

{¶ 5} On December 10, 2009, Auditor Eyink issued a schedule of audit findings, covering half-year periods from January 2004 through December 2008. Auditor Eyink determined that the Ugicom cable installers were Ugicom employees, not independent contractors, and revised the audit findings accordingly. (Stip.R. 8.) The reclassification resulted in Ugicom owing $346,817.55 in workers' compensation premiums retroactively to the BWC. Ugicom protested the audit findings. Auditor Eyink denied Ugicom's protest,

noting that the Ugicom cable installers were employees pursuant to the factor test in R.C. 4123.01(A)(1)(c).

{¶ 6} On April 20, 2010, Ugicom filed an application for an adjudication hearing before the BWC's three-member adjudicating committee. Ugicom supported its application with a letter explaining why the cable installers were independent contractors, as well as the independent contractor agreement, the affidavit of Ugicom cable installer, Roger Sengendo, statements from another Ugicom cable installer and Ugicom's president, and several BWC certificates of premium payments from various Ugicom cable installers.

{¶ 7} In the letter, Ugicom asserted that the BWC's reliance on the factor test in R.C. 4123.01(A)(1)(c) was misplaced, as that statute concerned only construction contracts. Ugicom noted that the correct test was the common law right to control test. Ugicom contended that cable installers were independent contractors under the common law test, as they "control[led] the manner and means of performing the cable tv installation," decided "how many installations, if any, they [would] perform on any particular day," and decided "when and how many hours per day they [would] work." (Stip.R. 17.) Ugicom stated that the cable installers used their own trucks to go to the job sites, and used their own tools and equipment at the job site. Ugicom noted that in rare instances for large jobs, the cable installers could rent large excavating equipment from Ugicom, and Ugicom would deduct an equipment fee from the cable installer's pay. Ugicom also noted that, although it required its workers "to only perform outside installation of cable lines for Time Warner Cable," the "Contractors [were] free to work for other companies who install outside lines." (Stip.R. 18.)

{¶ 8} On August 26, 2010, the adjudicating committee held a hearing on the matter. Although the adjudicating committee heard testimony and received evidence at the hearing, the hearing was not recorded or otherwise made a part of the administrative record. In the adjudicating committee's order, mailed to the parties on October 7, 2010, the committee noted that "[b]ased upon the information submitted," including the independent contractor agreement and Ugicom's insurance information, "and the testimony elicited at the hearing," it was the decision of the adjudicating committee to deny Ugicom's protest. The committee stated that "[i]n making this determination, the Committee finds that the requirement in Ohio Revised Code § 4123.01(A)(1)(c) is

satisfied, with ten or more criteria that support a finding that the workers are employees." (Stip.R. 2.)

{¶ 9} Ugicom appealed the adjudicating committee's order to the administrator's designee. On September 30, 2011, the administrator's designee mailed his order to the parties. The order adopted the adjudicating committee's statement of facts and affirmed the adjudicating committee's decision, findings, and rationale.

{¶ 10} The magistrate concluded that the administrator abused his discretion by applying the test set forth in R.C. 4123.01(A)(1)(c) instead of the common law right to control test to determine whether the Ugicom cable installers were employees or independent contractors. The magistrate found support for his determination in *Archibald v. Gold Key, Inc.*, 5th Dist. No. 2002CA00118, 2002-Ohio-5761. *Archibald* concerned a television cable installer who worked for Gold Key, Inc., performing cable installation for Time Warner. Archibald pointed to the test in R.C. 4123.01(A)(1)(c) to demonstrate that he was an employee of Gold Key, and the court stated that, as "this case does not involve a construction employment issue," R.C. 4123.01(A)(1)(c) was inapplicable as Gold Key did "not meet the definition of [a construction contract in] R.C. 4123.79(C)(2)." *Id.* at ¶ 19. The magistrate recommended that we issue the writ of mandamus.

{¶ 11} The administrator presents the following objections to the magistrate's decision:

> [I.] The Magistrate erred when he found that the Administrator "abused his discretion by applying the test set forth at R.C. 4123.01(A)(1)(c) rather than the traditional common law test."
>
> [II.] The Magistrate erred when he failed to recognize that the Administrator's findings satisfy the common law test.
>
> [III.] The Magistrate erred in relying on the decision of *Archibald v. [G]old Key Inc.*, 5th Dist. No. 2002CA00118, 2002-Ohio-5761.

{¶ 12} Pursuant to Civ.R. 53(D)(4)(d), we undertake an independent review of the objected matters "to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." A relator seeking a writ of mandamus

must establish: " '(1) a clear legal right to the relief prayed for, (2) a clear legal duty upon respondent to perform the act requested, and (3) that relator has no plain and adequate remedy in the ordinary course of the law.' " *Kinsey v. Bd. of Trustees of the Police & Firemen's Disability & Pension Fund of Ohio*, 49 Ohio St.3d 224, 225 (1990), quoting *State ex rel. Consol. Rail Corp. v. Gorman*, 70 Ohio St.2d 274, 275 (1982). "A clear legal right exists where the [administrator] abuses its discretion by entering an order which is not supported by 'some evidence.' " *Id.* For ease of discussion, we will address the objections out-of-order.

{¶ 13} In his third objection, the administrator asserts that the magistrate erred in relying on *Archibald*, because the *Archibald* court "made no finding that the listed factors [from R.C. 4123.01(A)(1)(c)] could not be considered in non-construction cases to determine the issue of control in non-construction matters." (Objections, 11-12.) However, *Archibald* was a non-construction case, and the court held that R.C. 4123.01(A)(1)(c) could not be used in that action to determine employee status. The magistrate relied on *Archibald* for that purpose, and we find no error in the magistrate's reliance on *Archibald*.

{¶ 14} R.C. 4123.01(A) defines the term "employee" for the workers' compensation statutes. R.C. 4123.01(A)(1)(a) and (b) define an employee as a person "in the service of" either the state, a person, or a private corporation. R.C. 4123.01(A)(1)(c), however, states that "[e]very person who performs labor or provides services pursuant to a construction contract" is an employee "if at least ten of the following criteria apply," and the statute lists twenty different criteria. *See* R.C. 4123.01(A)(1)(c). R.C. 4123.79(C)(2) defines a construction contract as "any oral or written agreement involving any activity in connection with the erection, alteration, repair, replacement, renovation, installation, or demolition of any building, structure, highway, or bridge." The instant case does not concern a construction contract, as that term is defined in R.C. 4123.79(C)(2), and accordingly the factor test in R.C. 4123.01(A)(1)(c) is inapplicable in the instant action.

{¶ 15} Based on the foregoing, the administrator's third objection is overruled.

{¶ 16} In his first and second objections, the administrator asserts that the magistrate erred in finding that the adjudicating committee had applied the R.C. 4123.01(A)(1)(c) test, and not the common law test. The administrator asserts that "the

Committee did not apply the statutory test, but merely referred to some of the factors listed in that statute to determine the matter of control." (Objections, 8.)

{¶ 17} The administrator's contention that the committee did not apply R.C. 4123.01(A)(1)(c) is refuted by the plain language of the committee's decision. The committee expressly found that "the requirement in Ohio Revised Code § 4123.01(A)(1)(c) is satisfied, with ten or more criteria that support a finding that the workers are employees," and the committee listed the twelve R.C. 4123.01(A)(1)(c) factors it found were satisfied. (Stip.R. 2.) The committee did state that, "[a]lthough this [was] not a construction contract the same principles can be applied when determining who has control." (Stip.R. 2.) Despite that caveat, the committee did not simply use the principles from R.C. 4123.01(A)(1)(c) to determine the issue of control; rather, the committee expressly applied the R.C. 4123.01(A)(1)(c) test, found more than ten of the statutory factors satisfied, and on that basis determined that the Ugicom cable installers were employees.

{¶ 18} Under the common law, in order to determine whether a party is an employee or an independent contractor, the central question is "who had the right to control the manner or means of doing the work[?]" *Bostic v. Conner*, 37 Ohio St.3d 144 (1988), paragraph one of the syllabus. *See also Gillum v. Indus. Comm.*, 141 Ohio St. 373 (1943), paragraph two of the syllabus (noting that "if the employer reserves the right to control the manner or means of doing the work, the relation created is that of master and servant," however, "if the manner or means of doing the work or job is left to one who is responsible to the employer only for the result, an independent contractor relationship is thereby created"). To resolve this inquiry, courts must examine the individual facts of the case and consider a "number of factors, none of which are dispositive by themselves." *Hartings v. Xu*, 3d Dist. No. 10-13-11, 2014-Ohio-1794, ¶ 62, citing *Bostic* at 146. *See also Gillum* at 375 (noting that "[e]ach case must depend on its own facts, and ordinarily no one feature of the relation is determinative, but all must be considered together"). The factors to be considered in this determination include, but are not limited to, "such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the

length of employment; the type of business; the method of payment; and any pertinent agreements or contracts." *Bostic* at 146.

{¶ 19} The administrator asserts that the magistrate "erroneously concluded that the [R.C. 4123.01(A)(1)(c)] factors may not be applied or considered if the work is non-construction type work," and asserts that the R.C. 4123.01(A)(1)(c) test can be applied or considered in non-construction type cases because "the type of work being performed should not make an appreciable difference." (Objections, 9.) We disagree. If the General Assembly had intended for the twenty factor test to apply to or be considered in non-construction type cases, the legislature would not have limited the application of R.C. 4123.01(A)(1)(c) solely to construction contracts. The General Assembly purposefully set out a specific test for construction contract cases, while leaving the common law right to control test in tact for all other types of working relationships. *See Hartings* at ¶ 50 (noting that "the legislature only intended to redefine employees as it relates to construction contracts in workers' compensation cases when it enacted R.C. 4123.01(A)(1)(c)," and accordingly R.C. 4123.01(A)(1)(c) did not supersede the "common law test set out in *Bostic*"); *Slauter v. Klink*, 2d Dist. No. 18150 (Aug. 18, 2000) (noting that, by enacting R.C. 4123.01(A)(1)(c), the legislature intended to "substitute a statutory test for the traditional common law standard" for construction contract cases, but "the traditional common law test would still be used to evaluate employment relationships that fit within other parts of R.C. 4123.01(A)(1)").

{¶ 20} As R.C. 4123.01(A)(1)(c) expressly and unambiguously limits the factor test therein to construction contracts, we are not at liberty to expand the application of R.C. 4123.01(A)(1)(c) to other types of cases. *See Vought Industries, Inc. v. Tracy,* 72 Ohio St.3d 261, 265-66 (1995), quoting *State ex rel. Foster v. Evatt*, 144 Ohio St. 65 (1944), paragraph eight of the syllabus (noting that " '[t]here is no authority under any rule of statutory construction to add to, enlarge, supply, expand, extend, or improve the provisions of the statute to meet a situation not provided for,' " as a court's "obligation is to apply the statute as written"). Moreover, in contrast to the common law test, which instructs courts to examine the individual facts of the case, R.C. 4123.01(A)(1)(c) sets forth a formula to determine whether someone laboring under a construction contract is an employee or an independent contractor. The R.C. 4123.01(A)(1)(c) test thus makes certain

factors dispositive of the employment issue, and prevents the trier of fact from considering all of the individual facts of the case, as it must under the common law test.

{¶ 21} In requesting the instant writ of mandamus, Ugicom requested both that we vacate the orders of the adjudicating committee and the administrator's designee, and that we issue an order determining that the Ugicom cable installers are independent contractors. "Whether someone is an employee or an independent contractor is ordinarily an issue to be decided by the trier of fact." *Bostic* at paragraph one of the syllabus. Where the "evidence is not in conflict or the facts are admitted, the question of whether a person is an employee or an independent contractor is a matter of law to be decided by the court." *Id.* at 146. However, the issue becomes a jury question if "the claimant offers some evidence that he was an employee rather then an independent contractor," *Id.* at 146-47, or if "sufficient evidence has been submitted to allow reasonable minds to come to different conclusions on the issue." *Brown v. CDS Transport, Inc.*, 10th Dist. No. 10AP-46, 2010-Ohio-4606, ¶ 10.

{¶ 22} We are unable to resolve the independent contractor issue as a matter of law, as the contradictions between the adjudicating committee's conclusions of law and the record evidence make it apparent that certain facts are in dispute. Moreover, because the committee did not make findings of fact in its decision and did not identify evidence to support many of its legal conclusions, we are unable to discern the basis for many of the committee's legal conclusions.

{¶ 23} For example, the committee found that "[t]he employees of UGICOM must comply with the manner and methods of UGICOM in performing their work." (Stip.R. 2.) The committee cited no evidence to support this statement. *See* Ohio Adm.Code 4123-14-06(E) (stating that the adjudicating committee, in its decisions, must "state the evidence upon which the decision was based and the reasons for the committee's actions"). Although the committee stated that its decision was generally supported by the testimony and evidence submitted at the hearing, because the hearing was not recorded and the committee did not make findings of fact reflecting the evidence presented at the hearing, we do not know what evidence the committee relied on from the hearing. Sengendo averred in his affidavit, which was attached to Ugicom's April 20, 2010 letter, that he "independently complete[s] the jobs" he performs for Ugicom, that he controls "when and

how [he] perform[s] a particular job," and that "Ugicom does not exercise any control over [his] day-to-day activities." (Stip.R. 27-28.) In its letter to the adjudicating committee, Ugicom stated that the cable installers, utilizing their own "skills and expertise, decide how to install the cable lines." (Stip.R. 17.) Accordingly, the record evidence does not demonstrate that Ugicom controlled the manner and method of which the cable installers worked.

{¶ 24} The committee also stated in its decision that "[t]here was testimony at hearing that [the Ugicom cable installer's] jobs are assigned by computer," that they must "check their computer daily for their daily assignments," and that the "hours of work are established by UGICOM." (Stip.R. 3.) The independent contractor agreement states that "[t]here are no designated normal Business hours," but also states that the cable installers "shall offer services until job-call is completed" and "shall be responsible for tasks assigned by the Company on a day to day basis." (Stip.R. 24.) Sengendo averred that Ugicom "posts the available jobs on its website," that he was "free to choose any available job or not to perform any jobs on a given day," and that he decides "on the number of jobs [he] will perform and the particular jobs [he] will perform in any given day." (Stip.R. 27-28.) Accordingly, it is unclear whether the Ugicom cable installers have jobs assigned to them each day which they must complete, or whether they are free to choose to work any job or no job as Sengendo averred. *See Walters v. Americab, Inc.*, 118 Ohio App.3d 180, 183 (8th Dist.1997) (noting that the "[t]he overriding factor" in determining the right to control issue is whether the worker "had total control over the days and hours he worked"); *Soloman v. Dayton Window & Door Co., L.L.C.*, 196 Ohio App.3d 16, 2011-Ohio-6182,      ¶ 16 (2d Dist.) (noting that "[t]elling a hired person that he must work from this hour to this hour shows control over that person," but "[s]etting a deadline for the completion of a job does not show the same level of control").

{¶ 25} The committee also concluded that the Ugicom "employee is required to follow the order of work set by UGICOM in the installation of cable lines." (Stip.R. 3.) The committee cites no evidence to support this statement and, in contrast, Sengendo averred that he controls when and how he performs a particular job and that Ugicom exerts no control over his day-to-day activities. Similarly, in its letter to the adjudicating committee, Ugicom stated that it "does not dictate how the installation occurs." (Stip.R. 17.) The

committee also concluded that the fact that the Ugicom worker was "paid weekly" demonstrated an employment relationship. (Stip.R. 3.) While the record evidence does indicate that the Ugicom cable installers were paid weekly, they were not paid based on the hours they worked. Rather, Ugicom paid the cable installers per job they completed, a fact which indicates an independent contractor relationship. *See Gillum* at 375.

{¶ 26} The magistrate correctly determined that the adjudicating committee abused its discretion by applying the R.C. 4123.01(A)(1)(c) test herein and by failing to apply the common law right to control test. As the facts appear to be in dispute, we are unable to apply the right to control test and determine the employment status of the cable installers as a matter of law.

{¶ 27} Based on the foregoing, we overrule the administrator's first and second objections to the magistrate's decision.

{¶ 28} Following independent review, pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we grant the requested writ of mandamus and command the administrator to vacate and set aside the orders from the administrator's designee and the adjudicating committee mailed to the parties on September 30, 2011 and October 7, 2010, respectively. We order the administrator to issue a new order which adjudicates Ugicom's protest, and which is supported by evidence from the record and consistent with this decision.

*Objections overruled;*
*writ of mandamus granted.*

SADLER, P.J. and TYACK, J., concur.

_____

# A P P E N D I X

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Ugicom Enterprises, Inc.,          :

      Relator,                                                  :

v.                                                                    :                    No.  13AP-527

Stephen Buehrer, Administrator,                  :                  (REGULAR CALENDAR)
Bureau of Workers' Compensation,
                                    :

      Respondent.                                          :

                                    :

M A G I S T R A T E ' S   D E C I S I O N

Rendered on July 29, 2014

*Zashin & Rich Co., LPA,* and *Scott Coghlan*, for relator.

*Michael DeWine*, Attorney General, and *Kevin J. Reis*, for respondent.

IN MANDAMUS

{¶ 29} In this original action, relator, Ugicom Enterprises, Inc. ("Ugicom" or "relator"), requests a writ of mandamus ordering respondent, Administrator, Ohio Bureau of Workers' Compensation ("administrator" or "respondent") to vacate the July 19, 2011 order of his administrator's designee that determines that certain persons were Ugicom employees rather than independent contractors as claimed by relator, and to enter an order finding that those persons were not Ugicom employees for the purpose of reporting payroll.

{¶ 30} In the event this court upholds the decision of the administrator's designee, relator requests a writ ordering respondent to apply Ohio Adm.Code 4123-17-17(C) limiting retroactive premium adjustment to a period starting 24 months prior to the date the bureau of workers' compensation ("bureau") sent notice to relator of its intent to audit.

{¶ 31} Also, relator requests a writ ordering respondent to reclassify those persons determined not to be independent contractors to manual code 7600 rather than manual code 6325.

Findings of Fact:

{¶ 32} 1. Ugicom is an Ohio corporation that contracted with Time Warner Cable ("TWC") to provide outside installation of cable lines to TWC customers.  Michael Kibuuka is the president of Ugicom.

{¶ 33} 2. Ugicom uses "contractors" to perform the installation of cable lines to TWC customers.

{¶ 34} 3. By letter sent May 13, 2009, bureau premium auditor Mary Jo Eyink informed relator that its account had been selected for audit.  The letter further advised:

> During the audit appointment, a person that is knowledgeable of the business operations and your financial records that are requested on the next page should be available. Also, a visual rating inspection (walking tour) of the operational facilities may need to be done.

{¶ 35} 4. On October 20, 2009, a bureau auditor conducted an onsite audit covering the period January 1, 2004 to June 30, 2009.

{¶ 36} 5. Apparently, at Ugicom's request, Joel Wilson, CPA, prepared a two-page letter or written statement dated October 20, 2009 that is addressed to auditor Eyink. The Wilson statement provides:

> There were no payrolls for years 2004, 2005 and 2006. Amounts reported to Ohio BWC were for the President's draw.
>
> * * *
>
> Attached is a copy of the Contract of Services Agreement required to be read and signed by all independent

contractors. The conducting of business with independent contractors as subcontractors is common for the TV cable installation business.

Independent subcontractors own mostly the mini walk-behind vibrator plow. Whereas, Ugicom Enterprises, Inc. owns the bigger sit-on plow machines for seldom bigger jobs. The sit-on plow's high cost would be an extreme burden to the independent subcontractors. Ugicom rents the bigger sit-on plow to the subcontractor at a reduced rate.

<u>Concerning duties of the President:</u> The President is the main liaison between Time Warner Cable and Ugicom Enterprises Inc. The President has performed the marketing, sales and executive communications. On a daily basis, the President gets the batches of jobs from the Time Warner Cable website and puts the jobs on the Ugicom Enterprises Inc. website and then assigns specific jobs to each individual subcontractor's web page. Each subcontractor pulls the jobs from their web page and independently performs the job. Once the job is complete, the subcontractor returns to Ugicom's website and keys in all pertinent information to demonstrate that the job is closed out. The President, then transfers the closed out job information back to the Time Warner Cable site.

<u>Concerning duties of Daily Manager:</u> The Daily Manager's role is to assure that the jobs are finished and on time. The Daily Manager performs some office coordinations and clears disputes with Time Warner.

<u>Clarification of Operations and Operations of the Subcontra[c]tors:</u> Except for the manual and physical cable installation of the subcontractors and some office coordination, the business runs as web-based virtual offices with all jobs communicated by websites.

Time Warner has a website that it provides batches of jobs to Ugicom (through Ugicom's window on Time Warner's website).

Ugicom has a 21st century web-based system for distributing jobs to independent subcontractors to start jobs. Ugicom organizes the jobs and downloads the jobs to each subcontractor's customized web page. Ugicom's web-based system also provides the means for the subcontractor to

close the job once the job is finished (by the subcontractor keying information into the subcontractor's web page). In between the start and finish of the job, the subcontractor has total independence to complete the job according to specifications without supervision.

On a daily basis, the subcontractor goes to his website before day every morning, prints the jobs to be performed with addresses and specifications. The subcontractor provides his own transportation, tools and equipment to complete the job. In the evening, the subcontractor goes back to the website and closes the job.

All work is underground. All work is itemized with codes, descriptions and standardized related pay. Description examples include wire under sidewalk, wire under driveway, wire under flower bed and many others. Each of the previous descriptions have related codes and pay. Therefore, when a subcontractor closes out a job, the subcontractor will know their pay to be received immediately.

Additional Points about Virtual Web-based System:

- Communications are by website and email
- Everyone is required to have their own laptop, cell phone, tools and equipment (except for rare huge jobs requiring large and expensive equipment)
- Can literally work from anywhere
- Some subcontractors have not been seen for two years

{¶ 37} 6. On December 10, 2009, auditor Eyink issued a schedule of audit findings covering ten half-year periods beginning with the period January 1, 2004 through June 30, 2004. For each of the ten half-year periods, the schedule indicated the payroll reported aside the payroll found.

{¶ 38} The payroll reported and the payroll found for each of the ten half-year periods are as follows:

| Audit Period | Payroll Reported | Payroll Found |
| --- | --- | --- |
| 1/1/2004 to 6/30/2004 | $18,000 | $95,212 |
| 7/1/2004 to 12/31/2004 | $19,800 | $97,012 |

| | | |
|---|---|---|
| 1/1/2005 to 6/30/2005 | $12,480 | $174,172 |
| 7/1/2005 to 12/31/2005 | $9,120 | $174,172 |
| 1/1/2006 to 6/30/2006 | $2,400 | $454,038 |
| 7/1/2006 to 12/31/2006 | $6,336 | $454,438 |
| 1/1/2007 to 6/30/2007 | $19,039 | $623,882 |
| 7/1/2007 to 12/31/2007 | $25,385 | $630,207 |
| 1/1/2008 to 6/30/2008 | $25,385 | $619,844 |
| 7/1/2008 to 12/31/2008 | $63,119 | $657,579 |

{¶ 39} 7. By letter dated December 10, 2009, auditor Eyink informed relator:

> Upon review of the audit, it was determined that Manual 6325 Cable laying by specialist contractors using automatic equipment - more accurately describes your operations. As a result, M-6325 was added effective 1-1-04. Audit findings have been revised accordingly.

{¶ 40} 8. On February 19, 2010, Michael Kibuuka signed a two-page unsworn statement that was sent to the bureau's audit department. The statement reads:

> [Three] As the President, I am the main liaison between the Company and Time Warner Cable. I receive a salary for my services. I receive a W-2 at the end of each year. Ugicom pays workers' compensation coverage for me.
>
> [Four] Ugicom contracts with Independent Contractors ("Contractors") to install the cable lines. Ugicom pays the Contractors based on the jobs they perform.

[Five] On a daily basis, Ugicom downloads its work orders from TWC's website for the Greater Cincinnati and Dayton areas. These jobs, in turn, are placed on Ugicom's website, www.ugicom.com, for the Contractors to select at their discretion. All work is itemized with codes and descriptions to allow the Contractor to understand the type of job that is required (i.e., wire under sidewalk, wire under flower bed, wire under driveway). Each Contractor is responsible for selecting the jobs the Contractor wishes to perform and thereafter independently performing the job. Ugicom does not control the manner in which the Contractors select or perform their jobs. Once the Contractor completes the job, he or she keys into Ugicom's website the pertinent job information and closes out this particular job. Ugicom created its website in 2002.

[Six] On a weekly basis, Ugicom pays the Contractors based on the number and type of jobs completed during the prior work week. Ugicom pays per the job that is performed. Ugicom does not make any deductions. At the end of the year, the Company issues 1099 forms to its Contractors.

[Seven] The Contractors purchase and own their own transportation, tools, and equipment necessary to install the TWC cable lines. The Contractors are responsible for their own liability insurance. The Contractors pay for their own gas, transportation costs, and cell phones. Ugicom does not provide any financing for the purchase of the above items.

[Eight] The Contractors have a sticker on their transportation which states "Ugicom Enterprises Inc. — Contractor for Time Warner Cable." The Contractors also wear a TWC badge which states they are a contractor for Time Warner Cable. The Contractors occasionally wear a highly visible construction vest that is labeled "Cable TV" and "Contractor for Time Warner Cable." Ugicom does not issue or require uniforms for the Contractors.

[Nine] The Company has entered into a contract relationship with Fred Kibuuka to manage and maintain Ugicom's website. He posts the TWC jobs onto Ugicom's website for selection by the Independent Contractors. The Company issues Fred Kibuuka a 1099 at the end of the year for his services. Fred Kibuuka is not an employee of Ugicom as it does not control the manner in which he manages and maintains the website.

[Ten] Ugicom requires its Contractors to obtain their own workers' compensation coverage through the State of Ohio. The Company has implemented a system on its website in which the Contractors are required to confirm their workers' compensation coverage. Without this confirmation of workers' compensation coverage, the Contractor is unable to access Ugicom's website and obtain new jobs.

[Eleven] Ugicom communicates with its Contractors via their website and telephone communications. The Company rarely meets in person with the Contractors.

[Twelve] TWC requires its subcontractors to use its material (i.e. cable lines) for the outside installation. Accordingly, Ugicom places an order with TWC on a weekly basis for the materials that are necessary for the jobs. One of the Contractors arranges on his own to pick up this material from TWC's warehouse and distributes it to the other Contractors. Ugicom is not involved with this distribution process.

[Thirteen] As part of its contract with TWC, Ugicom has agreed not to work for other cable companies in the installation of outside cable lines. In order to maintain this non-compete relationship with TWC, Ugicom requires its Contractors to only perform outside installation of cable lines for Ugicom and TWC. These Contractors are free to work for other companies who install outside lines (i.e. the telephone company, the gas and electric company) as long as it does not involve cable line installation. The prohibition is only for cable lines.

[Fourteen] I have asked the Contractors to sign Independent Contractor Agreement memorializing this relationship. See agreement attached as Exhibit 1.

{¶ 41} 9. Earlier, on February 18, 2010, Roger Sengendo, a Ugicom "contractor," executed an affidavit, stating:

[One] I am an Independent Contractor ("Contractor") for Ugicom Enterprises Inc. ("Ugicom"). I have worked as a Contractor for Ugicom for approximately three years.

[Two] Previously, I was an independent cable installer with another company in Texas.

[Three] In addition to contracting with Ugicom, I also am a retailer on the internet.

[Four] For Ugicom, I install outside cable lines for Time Warner Cable ("TWC"). I feed the lines from the main outside cable box to apartments, homes, and businesses for TWC customers.

[Five] I use my own equipment and tools to dig underground to install the cable lines. Depending on the job, I bore under sidewalks, under driveways, or through flower beds. I have purchased the equipment and tools on my own.

[Six] Ugicom pays me based on the number of jobs I perform each week. Each job is priced differently based on the type of job. At the end of the year, Ugicom issues me a 1099 tax form. Ugicom does not deduct for any taxes.

[Seven] As a Contractor, I pay my own taxes (self employment, etc.) and carry my own insurance, including Ohio workers' compensation insurance.

[Eight] Ugicom utilizes a website to communicate to its Contractors about available jobs. I primarily utilize this website to communicate with Ugicom. The Company posts the available jobs on its website. I am free to choose any available job or not to perform any jobs on a given day. I control when and how I perform a particular job. Based on my prior experiences, I know how to install outside cable lines.

[Nine] Each day, I log into Ugicom's website via my home computer and select the particular jobs I want to perform. I thereafter independently complete the jobs. After I complete the jobs, I log into the website and indicate my completion of the jobs. On average, I complete ten jobs per day, depending on the weather.

[Ten] I have performed jobs through the Greater Cincinnati and Dayton areas.

[Eleven] I use my own van to travel to the job sites. I pay for my own travel costs (gas, insurance, etc.). I also have my own cell phone. For identification purposes, I have a sticker on

my van which reads: "Ugicom Enterprises Inc. — Contractor for Time Warner Cable."

[Twelve] I have obtained my own workers' compensation coverage through the State of Ohio. * * * I contacted the BWC office via the phone and obtained my coverage through the bureau's website.

[Thirteen] I do not wear a uniform. For identification purposes, I wear a badge stating "Contractor — Time Warner Cable." I also wear a brightly colored construction vest which reads "Cable TV" and "Contractor for Time Warner Cable."

[Fourteen] On occasion, as needed, I communicate with one of TWC's technicians for advice if I have a technical problem with a job.

[Fifteen] At times, I work with other Contractors on a job if I am really busy or if it is [a] large job. I directly coordinate with the Contractor if I need the assistance.

[Sixteen] I do not consider myself an employee of Ugicom. Ugicom does not exercise any control over my day-to-day activities. I decide on the number of jobs I will perform and the particular jobs I will perform in any given day. I work independently and am self-employed.

{¶ 42} 10. On February 18, 2010, Michael Lwanga, a Ugicom "contractor" executed an affidavit that reads similar to the Sengendo affidavit.

{¶ 43} 11. The record contains a multipage document captioned "Ugicom Enterprises Independent Contractor Agreement." This pre-printed agreement was obviously drafted by Ugicom and offered to its contractors for signature. The agreement of record is pre-printed by Ugicom for the signature of Michael Lwanga. The Lwanga agreement contains eleven enumerated paragraphs, nine of which are set forth below:

Whereas the Company desires [to] retain the services of the Independent Contractor to **install Cable technology in the Company's area of business operations** the Independent Contractor represents itself as competent and qualified to accomplish the specific requirements of this contract to the satisfaction of the Company therefore this contract is entered into under the following terms and conditions:

[One] The Contractor agrees to perform the services described in the attached "Scope of Services" contained in Schedule 1 to this Contract.

[Two] Terms of Contract: The term of this contract is one year effective September 1, 2009 ending August 31, 2010. Notwithstanding the agreement term, the Company may terminate this Agreement for non-performance of services, breach of the company policies without notice and without regard to the Agreement term. Parties by mutual agreement may renew the agreement term unless either party gives the other party two weeks' notice of intent of non-renewal of the Agreement.

[Three] Payment:

A. Amount of Payment: Each cable installation shall carry a unique service code(s) in Schedule 2 to this Agreement. The Company shall pay the contractor once a week by direct deposit upon logging the contractor's services. The Company shall compensate the Contractor for the services in accordance with the payment rates set in Schedule 2 to this Agreement. These rates are subject to change at any time without notice by the Company.

B. Mode and Manner of Payment: The Company will make out payment to The Independent Contractor, on the first business day of every month to the address in the recitals to this Contract.

C. Third Party Billables: Contractor will submit to the Company any payments made for purchases from third parties for items not covered in this contract. This section covers items costing more than $100.00 (One hundred dollars and zero cents only). Any such purchases will only be made with the prior express consent of the Company. Third party receivables will be payable no more than 30 days after being invoiced by Contractor.

* * *

[Four] Termination: Either party may terminate the contract without cause by giving 60 days written notice to the other party. All outstanding dues must be paid upon effective date of termination.

[Five] <u>Breach of Contract</u>: If Contractor fails to fulfill his/her obligations, The Company may terminate this contract by giving 30 days written notice to the Contractor of intent to terminate the contract. The Company must give Contractor a reasonable period to remedy any alleged breach prior to the lapse of the thirty day period. Contractor may terminate contract by giving 10 days written notice for non-payment of bills due, as specified in Schedule 1 to this Contract.

[Six] <u>Confidentiality</u>: All business related information including personal information, trade secrets, information labeled "For official use only", received during the course of business shall remain confidential and proprietary. No disclosure shall be made to third parties of this information without the express consent of the owner of such information.

[Seven] <u>Indemnification</u>: The independent contractor shall obtain liability insurance indemnifying and holding the Company harmless against all liability set forth to cover the following risks: _____ all _____. The independent contractor shall carry the following minimum limits _ two million _. Ugicom shall be listed as the additional insured. The Independent contractor shall maintain this coverage at all times and failure to maintain coverage shall be grounds for termination of employment. In consideration thereof, the Company shall advance the Contractor such payment as are required to obtain the coverage immediately upon the signing of this Agreement. This advance shall be recoverable from the Contractor's net pay. This policy shall insure the Contractor against any claims for errors, omissions or general liability for actions done in the ordinary course of performance of duties under this Contract.

[Eight] <u>Governing Law</u>: This contract shall be governed by the laws of the State of Ohio and applicable federal law. All disputes under this Contract shall be subject to mandatory arbitration under the laws of the State. The venue for arbitration under this contract shall be in the city of Cincinnati in the State of Ohio. The arbitrator's ruling shall be final as to liability. Each party will bear its own costs.

[Nine] <u>Mandatory Arbitration</u>: Any disputes under this contract save for non-payment of services shall be subjected to mandatory arbitration under the Commercial Arbitration

Rules of the American Arbitration Association in force at the time of lodging of a claim for arbitration. Arbitrator's award including an order for costs shall be final and non-appealable in a court of law.

{¶ 44} 12. By letter dated April 1, 2010, auditor Eyink informed Ugicom:

Your complaint received on 3/9/2010 protesting audit findings for the period from 1-1-04 through 6-30-09 has undergone a departmental review. Regrettably, the BWC has denied your request and the audit findings have been affirmed.

The requirements for being an independent contractor are found in Ohio Revised Code Section 4123.01. BWC uses a factor test to determine employee/employer relationships. Because the following conditions apply: 1) a non compete clause, 2) requires notice to the other party for termination of the contract or non renewal of the contract, 3) requires the [Independent Contractor] to be responsible for tasks assigned by company on a day to day basis within a two hour response time to assignments, 4) risk supplies at its expense, supplies that are needed by the [Independent Contractor] to perform such services, 5) risk provides appropriate protection and security for equipment stored by the [Independent Contractor] at its warehouse[,] 6) the risk provides larger equipment needed for larger jobs, 7) the [Independent Contractor]'s services are integrated into the regular function of the risk, 8) a continuing relationship exists between both parties, 9) the [Independent Contractor] is required to make written reports on the computer each day showing progress and completion of work, 10) the [Independent Contractor] is paid on a regular basis for the work performed, 11) the risk paid relocation and housing expenses for some of the [Independent Contractor]'s, 12) the [Independent Contractor]'s were required to show the company's name on their trucks and to wear badges reflecting the risk's name, 13) most of the [Independent Contractor]'s did not obtain Workers compensation insurance until 2008 and often had lapsed or cancelled policies, and 14) some of the 1099's indicated the same address as the risk, had no address or social security numbers listed. Based on these factors, we have determined that there was an employee/employer relationship.

{¶ 45} 13. On April 2, 2010, the bureau issued an invoice to Ugicom indicating a balance due in the amount of $346,817.55.

{¶ 46} 14. By letter dated April 20, 2010, addressed to the bureau's adjudicating committee, Julie M. Bruns, Esq., of the law firm of Frost Brown Todd LLC, responded to Eyink's April 1, 2010 letter. Bruns extensively argued that the "contractors" at issue are independent contractors and not Ugicom employees.

{¶ 47} 15. Thereafter, Ugicom completed a bureau form captioned "Application for Adjudication Hearing." On the form filed with the bureau, Ugicom attached a copy of the April 20, 2010 Bruns letter.

{¶ 48} 16. Following an August 26, 2010 hearing, the bureau's three-member adjudicating committee mailed an order on October 7, 2010 that denied Ugicom's protest. The adjudicating committee order explains:

> **Background Facts and Issues Presented:** BWC audited the employer from 1/1/2004 to 6/30/2009. The auditor picked up employees additional earnings as reportable payroll. The auditor determined that there was payroll that the employer had failed to report to the Bureau.
>
> The employer protested the findings and requested a hearing before the Adjudicating Committee.
>
> * * *
>
> **Employer's Position:**
>
> The employer's representative stated the technicians and office management are all independent contractors. UGICOM installs outside cable lines for Time Warner Cable. These Independent Contractors use their own tools, trucks and set their own hours. There is no control exerted by UGICOM. These Independent Contractors can refuse to do jobs. When a job is completed by the Independent Contractors they will invoice UGICOM. These Independent Contractors provide their own Workers' Compensation Insurance. When these independent contractors use UGICOM's tools, there is a fee assessed to them to use the tools. Kibs Industries does the record keeping for the company and does customer satisfaction work. The owner assigns work by computer not directly with the independent contractors. The owner rarely needs to contact the

independent contractors. The order of work or the tools needed to complete the jobs are determined by the independent contractor. The length of time it takes to complete a job is determined by their independent contractors. The independent contractors are not trained by UGICOM. They are experienced cable line installers. The independent contractors pay for their own truck, fuel and car insurance. Cell phones are paid for by the independent contractors. Time Warner does require labeling of the trucks. The independent contractors are required to wear Time Warner Cable badges that state Tech: UGICOM Time Warner Cable. Kibs Industries does provide customer services and bookkeeping services for UGICOM. However, there is no direction given by UGICOM to Kibs.

### Bureau's Position:

BWC's representatives stated that a letter dated 10-20-09 from the employer indicates that the president does marketing, sales and regional communications. He then posts jobs to a web site and "subcontractors" completes [sic] the jobs. The workers must have a sign on the truck listing the worker as a UGICOM worker. The workers must also wear a UGICOM badge on their shirts when dealing with customers. UGICOM organizes and distributes the jobs to the subcontractor. The sub contractors must do the jobs assigned to them each day. The jobs list the customer's names and addresses. The workers are paid on a weekly basis via a direct deposit to the subcontractor[']s account. The workers are required to carry insurance provided by UGICOM and the insurance is deducted from their pay. The hours of work are controlled by UGICOM. The subcontractor must complete all jobs assigned to them that day. The subcontractors must sign a no compete clause so that they cannot work for other contractors. Subcontractors are required to contact customers within two hours of being assigned a job. The subcontractors cannot suffer a loss for a job. Supplies, equipments and materials are provided to the subcontractors for use. Disputes with customers are resolved by management of UGICOM and the subcontractors are required to fix the problems per management's instructions. The employer paid relocations expenses for its subcontractors. UGICOM claims to only have one employee, the owner. For part of the audit period even the owner was paid by 1099. The company has over $2 million dollars of income without any employees. All these facts show control

by UGICOM over these employees and thus the Audit should be upheld as there is an employer/employee relationship.

**Findings of Fact and Conclusion of Law:**

Based upon the information submitted and the testimony elicited at the hearing, including Subcontractor Agreements, and Insurance Information identified by the employer's representative at hearing it is the decision of the Adjudicating Committee to **DENY** the employer's protest. The Committee is persuaded by the Bureau's evidence, and finds that the employer has failed to demonstrate that the workers at issue are independent contractors. In making this determination, the Committee finds that the requirement in Ohio Revised Code § 4123.01 (A)(1)(c) is satisfied, with ten or more criteria that support a finding that the workers are employees. Although this is not a construction contract the same principles can be applied when determining who has control. UGICOM controls the manner and method of which the employees work. Therefore, it is the order of the Adjudicating Committee that the workers in question are UGICOM employees, and required to be included in the payroll reported to the Bureau.

Specifically, the following factors demonstrate an employer/employee relationship[:]

[One] The employees of UGICOM must comply with the manner and methods of UGICOM in performing their work.

[Two] The employees are required to already have particular knowledge on how to install outdoor cable lines.

[Three] The employees of UGICOM are integrated into the regular functioning of UGICOM. There would not be a business without the cable installers as installing outdoor cable lines is what the business does.

[Four] There is a continuing relationship between UGICOM and the subcontractors. There was testimony at hearing that their jobs are assigned by computer. The UGICOM employees check their computer daily for their daily assignments. This is due to an ongoing employer/employee relationship.

[Five] Per the employment contract agreement each of UGICOM's employees must look at their assignments via computer and respond to the customer service request within 2 hours[.] The hours of work are established by UGICOM and all jobs must be completed the day they are started as there is no set quitting time per their employment contract.

[Six] Per the employment contract UGICOM employees are not allowed to install cable lines for any other company other than UGICOM as a contractor of Time Warner Cable. Time Warner Cable does require a non-compete clause to be signed by UGICOM employees which limits UGICOM employees to installing cable lines for Time Warner Cable only. One of their employees does work for other companies in another line of business selling heavy equipment in South Africa but he admitted during the hearing that in America he only works for UGICOM.

[Seven] The UGICOM employee is required to follow the order of work set by UGICOM in the installation of cable lines.

[Eight] The UGICOM employee is required to notify UGICOM of the completion of each job for which they have been assigned to complete that day.

[Nine] The UGICOM employee is paid weekly.

[Ten] Although the UGICOM employees testified that they do not use UGICOM tools their employment contract indicates; with prior approval UGICOM employees will be reimbursed for expenses associated with completing a job. The employer UGICOM purchases and provides a specific cable required by Time Warner Cable to their employees for installation. Time Warner Cable will provide any heavy equipment needed to UGICOM for digging and installing of outdoor cable lines.

[Eleven] UGICOM employees testified that they do not realize a profit or suffer a loss as a result of the services they perform. UGICOM admitted during the hearing they pay for mistakes made by their employees.

[Twelve] Per the employment contract the workers are required to carry insurance provided by UGICOM and the insurance is deducted from their pay.

Per the contract signed by the employees and the Schedule 1 Scope of Services the majority of the contract requirements and benefits indicate there is an **employer/employee relationship** which is contrary to the title of the contract; **Independent Contractor.**

The contract provisions are very compelling in finding an employer/employee relationship exists. Services are to be offered by the employee until the job call is completed. Additional equipment purchased by the employee to complete job pursuant to this contract will be reimbursed by the employer with prior authorization.

Of particular concern by the Committee is that one employee who testified he had Workers Compensation Insurance and that he has had it for the last 10 years he has been employed with UGICOM actually only took out Workers Compensation Insurance after the Bureau's Audit of the employer was initiated as established by the BWC Auditor. Actually almost all of UGICOM's employees only took out Workers' Compensation Insurance after the Bureau Audit.

(Emphasis sic.)

{¶ 49} 17. Pursuant to R.C. 4123.291(B), relator administratively appealed the order of the adjudicating committee to the administrator's designee.

{¶ 50} 18. In support of its appeal, counsel for Ugicom submitted a 22-page brief. At page seven, the brief submits three issues:

[One] Whether Ugicom's workers are Independent contractors under Ohio law or;

[Two] Whether the BWC applied the wrong test "the construction contract test" to conclude that Ugicom's workers were employees under Ohio Law?

[Three] Whether BWC's properly applied the ten part construction contract test under § 4123?

{¶ 51} 19. Following a July 19, 2011 hearing, the administrator's designee mailed an order on September 30, 2011 that affirms the order of the adjudicating committee. The order of the administrator's designee explains:

> At issue before the Administrator's Designee was the employer's protest of audit findings for the period January 1, 2004, to June 30, 2009. Specifically, the employer objected to the inclusion of payroll for workers the employer considered independent contractors.
>
> * * *
>
> The Administrator's Designee adopts the statement of facts contained in the order of the Adjudicating Committee.
>
> Based on the testimony and other evidence presented at the hearing, the Administrator's Designee affirms the decision, findings, and rationale set forth in the order of the Adjudicating Committee.

{¶ 52} 20. On June 18, 2014, relator, Ugicom Enterprises, Inc., filed this mandamus action.

Conclusions of Law:

{¶ 53} The main issue is whether respondent abused his discretion in determining that Ugicom's cable installers were Ugicom employees rather than independent contractors, and, thus, Ugicom was required to report its cable installer payroll to the bureau for purposes of determining the appropriate premium for workers' compensation coverage. Relator contends that respondent abused his discretion by applying the test for determining whether a person is an employee or independent contractor as set forth at R.C. 4123.01(A)(1)(c) rather than the traditional common law or "right to control" test.

{¶ 54} Finding that respondent abused his discretion by applying the test set forth at R.C. 4123.01(A)(1)(c) rather than the traditional common law test, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.

{¶ 55} R.C. 4123.01(A) defines "employee" as that word is used in the laws pertaining to the Ohio workers' compensation system.

{¶ 56} Among the definitions provided, R.C. 4123.01(A)(1)(c) currently provides that employee means:

Every person who performs labor or provides services pursuant to a construction contract, as defined in section 4123.79 of the Revised Code, if at least ten of the following criteria apply:

(i) The person is required to comply with instructions from the other contracting party regarding the manner or method of performing services;

(ii) The person is required by the other contracting party to have particular training;

(iii) The person's services are integrated into the regular functioning of the other contracting party;

(iv) The person is required to perform the work personally;

(v) The person is hired, supervised, or paid by the other contracting party;

(vi) A continuing relationship exists between the person and the other contracting party that contemplates continuing or recurring work even if the work is not full time;

(vii) The person's hours of work are established by the other contracting party;

(viii) The person is required to devote full time to the business of the other contracting party;

(ix) The person is required to perform the work on the premises of the other contracting party;

(x) The person is required to follow the order of work set by the other contracting party;

(xi) The person is required to make oral or written reports of progress to the other contracting party;

(xii) The person is paid for services on a regular basis such as hourly, weekly, or monthly;

(xiii) The person's expenses are paid for by the other contracting party;

(xiv) The person's tools and materials are furnished by the other contracting party;

(xv) The person is provided with the facilities used to perform services;

(xvi) The person does not realize a profit or suffer a loss as a result of the services provided;

(xvii) The person is not performing services for a number of employers at the same time;

(xviii) The person does not make the same services available to the general public;

(xix) The other contracting party has a right to discharge the person;

(xx) The person has the right to end the relationship with the other contracting party without incurring liability pursuant to an employment contract or agreement.

{¶ 57} The above definition of "employee" is the current version of a 1996 amendment to R.C. 4123.01 that first became effective on September 17, 1996 and added a new subsection to the statute. *Slauter v. Klink,* 2d Dist. No. 18150 (Aug. 18, 2000).

{¶ 58} As referenced in R.C. 4123.01(A)(1)(c)'s definition of "employee," R.C. 4123.79(C)(2) currently provides:

"Construction contract" means any oral or written agreement involving any activity in connection with the erection, alteration, repair, replacement, renovation, installation, or demolition of any building, structure, highway, or bridge.

{¶ 59} Thus, as to cases arising from a construction contract, the statutory test set forth at R.C. 4123.01(A)(1)(c) is to be applied rather than the traditional common law test.

{¶ 60} In *Gillum v. Indus. Comm.,* 141 Ohio St. 373 (1943), at paragraph two of the syllabus, the court states:

Whether one is an independent contractor or in service depends upon the facts of each case. The principal test applied to determine the character of the arrangement is that if the employer reserves the right to control the manner or means of doing the work, the relation created is that of

master and servant, while if the manner or means of doing the work or job is left to one who is responsible to the employer only for the result, an independent contractor relationship is thereby created.

{¶ 61} In Bostic v. Connor, 37 Ohio St.3d 144 (1988), at paragraph one of the syllabus the court states:

Whether someone is an employee or an independent contractor is ordinarily an issue to be decided by the trier of fact. The key factual determination is who had the right to control the manner or means of doing the work. (*Gillum v. Indus. Comm.* [1943], 141 Ohio St. 373, 25 O.O. 531, 48 N.E.2d 234, approved and followed.)

{¶ 62} As earlier noted, in its August 26, 2010 order, the adjudicating committee applied the R.C. 4123.01(A)(1)(c) test for determining whether the Ugicom cable installers were independent contractors or Ugicom employees. The committee recognized that the scenario does not involve a construction contract. As the committee put it:

Although this is not a construction contract the same principles can be applied when determining who has control. UGICOM controls the manner and method of which the employees work.

{¶ 63} As earlier noted, the question presented is whether respondent abused his discretion in applying the R.C. 4123.01(A)(1)(c) test rather than the common law "right to control" test.

{¶ 64} The question is compellingly answered by the decision of the Fifth District Court of Appeals in *Archibald v. Gold Key Inc.,* 5th Dist. No. 2002CA00118, 2002-Ohio-5761.

{¶ 65} Robert Archibald was a television cable installer with Gold Key Inc. ("Gold Key") dba Network Connectors, performing cable installation for Time Warner, Inc. In March 1999, while installing cable, Archibald fell from a ladder sustaining serious injuries.

{¶ 66} Thereafter, Archibald filed a claim for workers' compensation. The Industrial Commission of Ohio ("commission") denied the claim based upon a finding that Archibald was an independent contractor and not an employee of Gold Key.

{¶ 67} In February 2001, Archibald appealed the denial of his claim to the Stark County Court of Common Pleas pursuant to R.C. 4123.512. (The *Archibald* court simply states that Archibald filed a complaint against Gold Key and the administrator of the Ohio Bureau of Workers' Compensation.)

{¶ 68} Gold Key and the administrator obtained summary judgment upon the trial court's finding that Archibald was an independent contractor and not a Gold Key employee. Archibald appealed the trial court's judgment to the Fifth District Court of Appeals.

{¶ 69} In one of two assignments of error, Archibald asserted that the trial court erred in finding he was not an employee of Gold Key and therefore lacked coverage under workers' compensation. The court of appeals agreed, sustaining the assignment of error and reversing the trial court judgment.

{¶ 70} Archibald had signed a contract to be an independent contractor of Gold Key. He had also signed an earlier contract with Gold Key and had provided his own workers' compensation coverage. However, Archibald had let the workers' compensation coverage lapse prior to returning to Gold Key and prior to his injury. Despite those facts, citing *Bostic*, Archibald argued that Gold Key so controlled the manner and means of doing the work that there arose an employment relationship.

{¶ 71} In an effort to rebut the written subcontractor agreement, Archibald pointed to the 20-point test under R.C. 4123.01(A)(1)(c) for determining whether an individual is an employee. The *Archibald* court rejected this argument, explaining:

> As Gold Key points out, this case does not involve a construction employment issue and therefore R.C. 4123.01(A)(1)(c) does not apply because Gold Key does not meet the definition of R.C. 4123.79(C)(2) * * *.

*Id.* at ¶ 19.

{¶ 72} Concluding that the trial court had erred, the Archibald court explained:

> Essentially, the facts are not in dispute. Appellant signed the independent contractor agreement as a condition of employment. * * * He was paid per installation, but trained by Gold Key. * * * He wore a designated uniform, purchased specialized tools from Gold Key, paid for the use of a Gold Key truck, received work orders each day from Gold Key at a

designated location, collected payment from customers, returned receipts at the end of each day to Gold Key and was responsible for notifying Gold Key of when he would not be reporting to work.

Although it is true a summary judgment motion may be granted when facts are not in dispute, it is not true when reasonable minds could come to different conclusions:

"Generally, where the evidence is not in conflict or the facts are admitted, the question of whether a person is an employee or an independent contractor is a matter of law to be decided by the court. See *Schickling v. Post Publishing Co.* (1927), 115 Ohio St. 589, 155 N.E. 143, syllabus. However, the issue becomes a jury question where the claimant offers some evidence that he was an employee rather than an independent contractor." *Bostic* at 146-147, 524 N.E.2d 881.

Because of the different interpretations available to the numerous undisputed facts, we conclude the question of whether appellant was an independent contractor or an employee is a jury issue.

*Id.* at ¶ 22-25.

{¶ 73} Here, respondent endeavors to distinguish *Archibald* by pointing out that *Archibald* was a right to participate case arising out of a common pleas court action while the instant original action is a mandamus case challenging a final order of the bureau. While this distinction exists, respondent fails to explain why this distinction is relevant or how the distinction diminishes the applicability of the *Archibald* court's reasoning to the issue presented here.

{¶ 74} The magistrate finds that *Archibald* compels the issuance of a writ of mandamus.

{¶ 75} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent to vacate the July 19, 2011 order of his administrator's designee, and, in a manner consistent with this magistrate's decision, enter a new order that adjudicates relator's protest.

/S/ MAGISTRATE
KENNETH W. MACKE

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).